**Investment Properties, Inc., James B. Foster, and Pizzagalli Construction Company v. Jonathan Lyttle, Dennis Keefe, Lyttle & Keefe Architects, Inc., and Keefe Associates, Inc.**

[739 A.2d 1222]

No. 98-050

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed August 27, 1999

488

*John Davis Buckley* and *Jeffry W. White* of *Theriault & Joslin, P.C.*, Montpelier, for Plaintiffs-Appellants Investment Properties, Inc. and Foster.

*Allan R. Keyes* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Plaintiff-Appellant Pizzagalli Construction Co.

*Michael B. Clapp*, Burlington, for Defendants-Appellees.

**Johnson, J.** Plaintiffs appeal an order of the superior court granting summary judgment for defendants on the majority of plaintiffs' claims.[1] Plaintiffs are Investment Properties Incorporated (IPI) (the project owner of the Overlake Condominium project), James Foster (IPI's agent), and Pizzagalli (the general contractor for the project). Plaintiffs sued defendant architects in a variety of capacities under theories of negligence, intentional misrepresentation, negligent misrepresentation, and breach of implied and express warranties arising from a failed attempt to correct a problem with deteriorating subfloors in the condominium project. We affirm in part and reverse and remand in part.

---

[1] The only claim that survived summary judgment — a negligence claim asserted on behalf of the Overlake Condominium Homeowners Association (OCHA) — was voluntarily dismissed by plaintiffs pursuant to V.R.C.P. 41(a).

"[S]ummary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Bacon v. Lascelles,* 165 Vt. 214, 218, 678 A.2d 902, 905 (1996). The following material facts are undisputed. IPI was the project owner of the Overlake Condominium project, James Foster was IPI's agent, and Pizzagalli contracted with IPI to be its general contractor. IPI contracted with architects to provide architectural services. There was no contract between architects and either Foster or Pizzagalli. In the Spring of 1982, plaintiffs noticed that the concrete subfloors in the condominium units were deteriorating. The parties, in consultation with one another, settled on application of a material called Ardex K-15 over the surface of the concrete to remedy the situation. Architects made no affirmative representation concerning the suitability of the Ardex K-15 remedy. Architects agreed to pay $15,000 — the cost of the Ardex K-15 remedy — in return for a release of all claims against them arising out of the "design, installation and maintenance of a lightweight concrete underlayment for carpeting in the Overlake Condominium project."

The Ardex K-15 remedy was applied, but it also failed in May of 1988. In November of 1988, the Overlake Condominium Homeowners Association (OCHA) sued IPI, Foster and Pizzagalli for damages incurred as a result of the defective flooring. IPI, Foster and Pizzagalli filed a third-party complaint against the architects, which was dismissed without prejudice. The parties to the original litigation settled for $150,000. Architects made no contribution to the settlement. As part of the settlement, IPI, Foster and Pizzagalli were assigned all the rights of OCHA against the architects. Plaintiffs now pursue the assigned claims and also pursue architects to recover the settlement sum.

The current litigation was filed in May 1993. Plaintiffs alleged on behalf of IPI/Foster and Pizzagalli (1) a breach of the duty of professional care, (2) a breach of express and implied warranties that the materials selected to remedy a problem caused by other faulty materials were suitable for that purpose, (3) fraudulent misrepresentation, (4) and negligent misrepresentation. The warranty claims were based directly on the relationship between architects and plaintiffs while the other claims were based on a theory that architects should indemnify plaintiffs for the $150,000 settlement sum paid out to OCHA. Plaintiffs further alleged on behalf of OCHA (1) a breach of the duty of professional care and (2) breach of an implied warranty.

In their motion for summary judgment, architects argued that no contract existed between architects and Foster, between architects and Pizzagalli, or between architects and OCHA on which a breach of warranty claim could be based. They additionally argued that they did not make any representations to anyone about the suitability of the Ardex K-15 remedy and that any claims based on the use of lightweight concrete flooring material were barred by the release. Architects also asserted that the three-year statute of limitations applied to plaintiffs' claims because they were claims for personal property, and that this statute of limitations had expired. See 12 V.S.A. § 512(5).

The superior court granted summary judgment with respect to the majority of plaintiffs' claims, concluding that plaintiffs' contractual claims on behalf of Pizzagalli failed because there was no contract, and that those on behalf of IPI/Foster failed because of the release. The court furthermore held that plaintiffs' claims based on indemnification also failed because of the release and because they were claims for personal property and were thus subject to the three-year statute of limitations, which began running when OCHA filed the original suit in November of 1988.

The court held that the rights assigned to plaintiffs to sue on behalf of OCHA for failure of the Ardex K-15 remedy were subject to the six-year statute of limitations because the claim involved interference with use and enjoyment of property. See 12 V.S.A. § 511; *Alpstetten Ass'n, Inc. v. Kelly*, 137 Vt. 508, 512, 408 A.2d 644, 646 (1979) (six-year statute of limitations applies to action alleging interference with use and enjoyment of property because it is not "injury to the person"). Nonetheless, the court concluded that the undisputed facts did not indicate there was any misrepresentation by architects to OCHA, any express warranty, or any basis for finding an implied warranty, because implied warranties are applicable only to the business of selling and not to the business of manufacture. See *Bolkum v. Staab*, 133 Vt. 467, 470, 346 A.2d 210, 211 (1975) (implied warranties arise from business of selling, not business of manufacture). There was no direct contractual basis for finding a breach of warranty because it was undisputed that there was no contractual relationship between architects and OCHA. The court did not, however, grant summary judgment on the claim based on professional negligence asserted on behalf of OCHA because liability under this theory turned on a question of fact.

On appeal, plaintiffs confine their argument to three issues. Did the superior court err in: (1) applying the three-year statute of limitations

to plaintiffs' indemnification claims; (2) ruling that no warranties could be implied with respect to OCHA because of the lack of contractual privity; and (3) ruling that the release barred any claims based on failure of the Ardex K-15 remedy?

## I. The Statute of Limitations

We first address plaintiffs' contention that the trial court erred in applying the three-year statute of limitations, found in 12 V.S.A. § 512(5), to bar their indemnification claims. The trial court reasoned that, because plaintiffs were seeking to recover a sum of money, their claim was one for personal property governed by the three-year statute of limitations. The trial court reached this conclusion by applying *Foucher v. First Vt. Bank & Trust Co.*, 821 F. Supp. 916, 924 (D. Vt. 1993), in which the federal district court, applying Vermont law, held that damages for breach of duty as a bailee and the conversion of money assets were damages for personal property governed by the three-year statute of limitations.

The question on appeal then is whether the trial court properly determined that an indemnity action is for damage to personal property. An indemnity action is based on "'a right accruing to a party who, without active fault, has been compelled by some legal obligation . . . to pay damages occasioned by the negligence of another.'" *Chapman v. Sparta*, 167 Vt. 157, 159, 702 A.2d 132, 134 (1997) (quoting *Morris v. American Motors Corp.*, 142 Vt. 566, 576, 459 A.2d 968, 974 (1982)). The right to indemnification "exists where one party has expressly agreed or undertaken to indemnify another, or where the circumstances are such that the law implies such an undertaking." *Id.* See also *State v. Stewart's Ice Cream Co.*, 473 N.E.2d 1184, 1186 (N.Y. 1984) (in cases where unjust enrichment would result from third party assuming debt or obligation of another, contract to reimburse or indemnify is implied by law).

There is no statute of limitations specific to indemnity actions. Civil actions in general are subject to a six-year statute of limitations. See 12 V.S.A. § 511. Actions for assault and battery, false imprisonment, slander and libel, injury to the person, or damage to personal property, however, are subject to a special three-year statute of limitations. See 12 V.S.A. § 512. Plaintiffs argue that this Court should look to the underlying harm — the damage to the condominiums — in determining the applicable statute of limitations. Under plaintiffs' theory, the indemnification action would be categorized as an action for damage to real property as opposed to personal property

and would be subject to the general six-year statute of limitations as a result.

■ We agree with plaintiffs' theory. Based on our decision in *Union School District v. Lench*, 134 Vt. 424, 425, 365 A.2d 508, 509 (1976), it is clear that the homeowners' association had six years from the accrual of their cause of action to bring that suit. The facts indicate that their claim accrued in 1988 when the Ardex K-15 "fix" failed. Applying the same limitation period and date of accrual to the indemnity action as we would apply to the underlying action, we conclude that both the homeowners' association suit and this indemnity action were brought within the six-year limitation period from the accrual of the underlying claim.

The rationale for applying the same statute of limitations to the indemnity action as to the underlying action follows from the legislative intent behind our statutes of limitation. The United States Supreme Court has explained the purpose of statutes of limitation:

> Statutes of limitations . . . represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Railroad Telegraphers v. Railway Express Agency*, 321 U. S. 342, 349 (1944). These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

*United States v. Kubrick*, 444 U.S. 111, 117 (1979). The primary concern is fairness to the defendants, who "ought to be secure in [their] reasonable expectation that the slate has been wiped clean of ancient obligations" and should not be deprived of the ability to defend because evidence is no longer available. *Developments in the Law — Statutes of Limitations*, 63 Harv. L. Rev. 1177, 1185 (1950). The time limits represent a balance, affording the opportunity to plaintiffs to develop and present a claim while protecting the legitimate interests of defendants in timely assertion of that claim.

In applying these policies to the problem before us, a number of points are striking. First, the Legislature has enacted two broadly-

applicable limitation periods. For actions involving "injuries to the person" or "[d]amage to personal property," in either case "by the act or default of another," the Legislature has established a three-year statute of limitation. 12 V.S.A. § 512(4), (5). For most other civil actions, the limitation period is six years. See *id.* § 511. As we have emphasized in a number of opinions, the three year limitation period is based "upon the nature of the harm for which recovery is sought and not upon the nature of the action brought." *Kinney v. Goodyear Tire & Rubber Co.*, 134 Vt. 571, 575, 367 A.2d 677, 680 (1976). This characteristic distinguishes the § 512(4) and (5) exceptions to the general civil time limit from the many other narrower exceptions the Legislature has created. See, e.g., 12 V.S.A. § 521 (two-year limitations for medical malpractice).

Second, without an express indemnity contract, plaintiffs' action is based on a reallocation of the homeowners' loss from the persons whom the homeowners sued — that is, the builders and developers — to the architects who specified the building materials. We allow such loss shifting as a matter of fairness so that the party "'without active fault'" does not end up shouldering the loss, while the actively-negligent party escapes liability. *Peters v. Mindell*, 159 Vt. 424, 428, 620 A.2d 1268, 1270 (1992) (quoting *Morris v. American Motors Corp.*, 142 Vt. at 576, 459 A.2d at 974. Thus, the indemnity claim is not a new cause of action. Indeed, we created indemnity actions as an exception to our policy precluding contribution among or between joint tortfeasors. See *Bardwell Motor Inn, Inc. v. Accavallo*, 135 Vt. 571, 572-73, 381 A.2d 1061, 1062 (1977). The reallocation of the losses brought about by the indemnity claim is actually the continuation of the homeowners' cause of action by a different plaintiff. The damages claimed in this case are simply the homeowners' damages, as paid by one group of tortfeasors and asserted against another group of alleged tortfeasors.

Third, the factual issues to be resolved in the trial of this action, if a trial is necessary, relate solely to events that occurred in 1991 and 1992. The parties contest whether defendants were negligent in 1991, and again in 1992, in specifying the subfloor materials, whether their relationship at the time was such that indemnity is appropriate and whether a release signed by plaintiffs in 1992 bars the indemnity action. The effect of allowing a long limitation period to file derivative indemnity claims is that accurate fact-finding will be impaired by the passage of time.

Finally, this rule imposes no unfairness on the plaintiff in an indemnity action. Plaintiffs in this case were aware from the begin-

ning that they might be able to shift the loss to defendants and, as a result, joined defendants in the homeowners' association action. They chose, however, to dismiss defendants from the action only to reassert the claim years later.

Although our statute appears to be unique, some other courts in comparable circumstances have applied similar statutes to reach the same result. See, e.g., *United States v. Burton*, 580 F. Supp. 660, 661-62 (E.D. Mich. 1984) (limitation statute governing claims arising out of defective or unsafe condition of improvement to real estate, and not general civil action limitation statute, applies to indemnification action against architect of improvement); *Washington Courte Condominium Ass'n v. Washington-Golf Corp.*, 643 N.E.2d 199, 225-26 (Ill. App. Ct. 1994) (limitation statute governing claims against persons for design or construction of improvements to real property applies to indemnification action against contractors based on their design and construction of condominium); *Roberson v. Belleville Anethesia Assocs., Ltd.*, 571 N.E.2d 1131, 1133 (Ill. App. Ct. 1991) (medical malpractice statute of limitation applicable to "action for damages for injury or death" also covers implied indemnity claim).

■ For these reasons, we determine that the six-year statute of limitations of 12 V.S.A. § 511 applies. Whether we look to the date the original complaint was filed, see *Riblet Tramway Co. v. Marathon Electronics — Avtek Drive Division*, 159 Vt. 503, 506, 621 A.2d 1274, 1275 (1993), to the date that plaintiffs paid out the settlement sum, see *Cyr v. Michaud*, 454 A.2d 1376, 1385 (Me. 1983), or the date of the underlying injury, see *Smith-Moore Body Co. v. Heil Co.*, 603 F. Supp. 354, 360 (E.D. Va. 1985); *New Meadows Holding Co. v. Washington Water Power Co.*, 659 P.2d 1113, 1116 (Wash. Ct. App. 1983), plaintiffs filed suit within the six-year statutory time period. Granting summary judgment for architects on this issue, therefore, was error.

## II. Breach of Implied Warranty

Plaintiff Pizzagalli argues that the superior court erred in ruling that no warranties could be implied with respect to OCHA. Count VIII of plaintiffs' complaint alleged that architects impliedly warranted to OCHA that the materials would be suitable for the purpose intended. Architects countered that, because there was no contract between OCHA and architects, no implied warranty could have attached and therefore no breach could have occurred. The superior court held that there could be no implied warranties between

architects and OCHA because implied warranties "arise[] from the business of selling, rather than the business of manufacture." See *Bolkum*, 133 Vt. at 470, 346 A.2d at 211; *Board of Trustees of Union College v. Kennerly, Slomanson & Smith*, 400 A.2d 850, 853 (N.J. Super. 1979) (implied warranties do not apply to architects because they provide services rather than goods).

Pizzagalli raises a different issue on appeal from that which was raised below. In their memorandum opposing summary judgment, plaintiffs argued that the legal foundation for their claim was the implied warranty of fitness for a particular purpose contained in 9A V.S.A. § 2-315.[2] Plaintiffs also cited 9A V.S.A. § 2-318[3], which extends a seller's warranty to any person who may reasonably be expected to consume or be affected by the goods. By contrast, in their appellate brief, Pizzagalli refers to a warranty of fitness implied-in-law that is separate from the provisions of the Uniform Commercial Code. Pizzagalli cites one other jurisdiction that has held that architects may be held liable for a breach of an implied warranty even where no privity of contract exists. See *Beachwalk Villas Condominium Ass'n v. Martin*, 406 S.E.2d 372, 374 (S.C. 1991). Pizzagalli further argues that the superior court erred in ruling as a matter of law that no warranties are implied in a contract for architectural services because whether defendant architects here performed according to their implied agreement is a question of fact. See Comments, 9A V.S.A. § 2-315 (whether warranty arises in particular situation is question of fact determined by circumstances of contracting).

■ An issue generally cannot be raised for the first time on appeal. See *Morais v. Yee*, 162 Vt. 366, 372, 648 A.2d 405, 410 (1994). Despite developments elsewhere in the common law cited in Pizzagalli's appellate brief, plaintiffs relied on the UCC statutory

---

[2] Section 2-315 states:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

[3] Section 2-318 states:

> A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

provisions in their memorandum opposing summary judgment. These provisions are limited in their application to the sale of goods by contract, and thus the trial court correctly ruled that these statutory sections would not apply to the provision of architectural design services.

### III. Effect of the Release

Finally, plaintiffs IPI/Foster argue that the trial court erred in concluding as a matter of law that the release barred any claims by IPI/Foster based on the failure of the Ardex K-15 remedy. The construction of the release affects the fate of IPI/Foster's contract-based (warranty) claims and their indemnity claim. The release provided in relevant part:

> For and in consideration of the payment to Investment Properties, Inc., of $5,000 by Lyttle and Keefe Architects, Inc. and $10,000 by General Accident Insurance Company, Inc., Investment Properties, Inc. hereby releases and forever discharges Lyttle and Keefe Architects, Inc. and General Accident Insurance Company, Inc. of and from any and all claims, demands, damages, actions or causes of action related to the design, installation and maintenance of a lightweight concrete underlayment for carpeting in the Overlake Condominium project in Burlington, Vermont.

> It is understood and agreed that this is a full and final release of all claims of every nature and kind whatsoever, and releases claims that are known and unknown, suspected and unsuspected regarding the deterioration of said lightweight concrete as an underlayment for carpeting.

Plaintiffs IPI and Foster emphasize that the effect of the release is limited to "design, installation and maintenance" and that the Ardex K-15 remedy does not fall within this limited scope. They also argue that the provision of a suitable remedy for the problem was part of the consideration for the release and, because the remedy failed, consideration for the release failed as well. Finally, IPI/Foster also allege that they were induced to sign the release by architects' representations that Ardex K-15 would provide a suitable remedy. Architects, by contrast, focus on the fact that the release bars "any and all claims . . . related to" the lightweight concrete problem, and characterize the failure of the Ardex K-15 remedy as "related to" the lightweight concrete problem.

The trial court agreed with architects, concluding that the Ardex K-15 remedy was "maintenance" within the meaning of the release and that the consideration paid for the release was adequate. It reasoned that IPI and Foster as IPI's agent were therefore barred from bringing any claims against architects based on the failure of the original lightweight concrete subfloor or the material installed over it.

■ "A release is a contract." *Economou v. Economou*, 136 Vt. 611, 619, 399 A.2d 496, 500 (1979); see also *Leo v. Hillman*, 164 Vt. 94, 104, 665 A.2d 572, 579 (1995) (release treated as contract and interpreted according to parties' intent).

> The scope of a release is determined by the intention of the parties as expressed in the terms of a particular instrument considered in the light of all facts and circumstances. In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that this intention is to be determined by a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in the light of the surrounding facts and circumstances under which the parties acted.

*Economou*, 136 Vt. at 619, 399 A.2d at 500 (internal citation omitted).

In this case, the language of the document alone does not reveal the precise scope of the release. On one hand, the effect of the release is confined to "design, installation and maintenance." A release is required to be specific in order to be valid. See *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 331, 670 A.2d 795, 797 (1995) (validity of release turns upon whether language is sufficiently clear to reflect intent of parties). The language of a release, therefore, should be narrowly interpreted, and if the parties did not include certain terms this should be interpreted as intentional exclusion of those terms. Failure of the remedy is a distinct concept which the parties could have included, but declined to do so.

On the other hand, the parties chose to include broad language to bar *any* claim "related to" deficiencies in the lightweight concrete subfloor. Claims that arise from efforts to correct problems with the subfloor are arguably "related to" the subfloor (if not to its maintenance, then possibly to its original faulty design and/or installation). The parties also disagree about the significance of the $15,000 in consideration paid by architects to IPI/Foster. Plaintiffs argue that this amount would be insufficient as consideration for a release

pertaining to both the original subfloor and the remedy. It is difficult, however, to understand what architects would gain by paying for a release that applied only to material that was essentially going to be entirely replaced or covered.

■ Because the scope of the release cannot be determined from the language alone, it must be "resolved in the light of the surrounding facts and circumstances under which the parties acted." *Economou*, 136 Vt. at 619, 399 A.2d at 500. We therefore disagree with the trial court that the scope of the release can be resolved as a matter of law. While the construction of a release or contract is normally a question of law, when the language of the document is ambiguous and must be clarified by reference to external evidence, construction becomes a question of fact. See *Housing Vt. v. Goldsmith & Morris*, 165 Vt. 428, 430, 685 A.2d 1086, 1088 (1996). Therefore summary judgment on this issue was error.

## IV.

As a result of our disposition in this case, plaintiffs IPI and Foster continue to have contract-based (warranty) claims and an indemnity claim remaining against architects. Plaintiff Pizzagalli has only an indemnity claim remaining against architects. We express no opinion on the viability of plaintiffs' indemnity claims, in particular, whether the economic loss rule could bar the claims, as this issue is not before us on appeal and has in any case not been briefed by the parties.

*Affirmed with respect to claims on behalf of OCHA based on implied warranties. Reversed and remanded with respect to plaintiff IPI/Foster's contract-based claim and with respect to plaintiffs' indemnity claims.*