Chompupong v. Saigon Le, Inc., No. 1067-04 CnC  (Katz, J., June 3, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                          SUPERIOR COURT

Chittenden County, ss.:                                   Docket No. 1067-04 CnCiv


CHALRIMSAK CHOMPUPONG

v.

SAIGON LE, INC. and
CHAU NGUYEN


FINDINGS OF FACT AND
CONCLUSIONS OF LAW


        This matter came before the court on May 23, 2005.  On the basis of evidence presented, the following decision is announced.

        Plaintiff Chalrimsak Chompupong owns a building on Route 7 in Shelburne, which has been used for some time as a restaurant.  It had been

1

used by Chompupong's wife's corporation Asian Pearl to run a Thai restaurant, at which he did the cooking. When that restaurant closed, negotiations commenced with defendant Chau Nguyen for her to take over the premises and run a Vietnamese restaurant. Normally Chompupong's wife, and at times his nephew, conducted these negotiations although Chompupong would from time to time come up from the kitchen to engage in discussions with his wife.

Those negotiations resulted in a "Sublease Agreement" between Asian Pearl and Saigon Le, the respective corporations. This agreement was reached June 10, 2002, at least according to the date inserted on its first page. Although signed by their respective principals, it quite clearly is an agreement between two corporations. Thereafter, Chompupong testified that he sent his nephew to Mrs. Nguyen with another "Lease Agreement." The precise contents of this later agreement are somewhat unclear, as only pages 1 and 4, plus the notary's acknowledgment are included. It is not at all clear that there ever was a page 2 or 3. From what we have of the second agreement, it appears largely identical to the first and seems to have come off the same word processor document. The beginning and ending are essentially identical although the names of the parties change. The second lease agreement, was nominally executed June 14, again at least based upon the date inserted in its opening paragraph. If, however, one looks to the dates on which the notaries public took their respective acknowledgments, then the situation becomes more confused. The so-called "Sublease Agreement" was not acknowledged until June 14, the same day on which the asserted modifying "Lease Agreement" was made. But that modifying "Lease Agreement" was actually signed by Mr. Chompupong on July 10, 2002, hence four days earlier. It is therefore less than clear, which came first.

2

We have in mind, however, that civil cases, such as this, are not decided upon only clear evidence. The standard here is preponderance. This requires us to make decisions in confusing and less-than-clear environments with the decision going to evidence that may just be a little stronger. Applying that preponderance standard, we are persuaded that the "Lease Agreement," probably, came second and modified the "Sublease Agreement." The reason for this conclusion is that certain changes distinguishing the "Lease Agreement" from the "Sublease Agreement" are conceded to have been agreed upon by both parties. Specifically, the June 14th "Lease Agreement" puts the payment of rent to the 15th of the month, one day after its execution. Apparently possession of the premises was being held up for execution of the later, June 14 lease. Mrs. Nguyen testified that Plaintiff's Ex. 1, the June 14 "Lease Agreement," was brought to her for signature by Chompupong's nephew, and she asked him "Why a second contract?" The nephew replied that it was because Asian Pearl, the corporate sublessor of the June 10th "Sublease Agreement," was no longer operating. Hence, Plaintiff's Ex. 1 (Lease Agreement) post-dates Plaintiff's Ex. 2 (Sublease Agreement).

It is not clear who inserted "Saigon Le, Inc." below Mrs. Nguyen's signature, thereby possibly converting it to a corporate execution, or when it was done—after her signature or before. But we note that the draft document was redrafted from the earlier version to substitute named individuals, as both lessor and lessee, from the corporate entities who had been named in the earlier. We are, therefore, persuaded that the purpose of the second agreement was to alter the contracting parties from corporate to personal. Mrs. Nguyen has little command of spoken English. We do not know the extent of her ability to read. But she signed both documents and appears to be an intelligent person.

After the defendant-tenant's Saigon restaurant failed during the summer of 2004, plaintiff-landlord locked out those running it. At that point, he may have left for Thailand, his native land, or he may have been there already. In any case, he did not take effective steps to find a new tenant for the space. He was unwilling to retain a broker if the latter would be charging him a commission. He did not post a "For Rent" sign until sometime in February 2005. The place remains vacant although this is a difficult period for Route 7 businesses in view of the massive road reconstruction now in progress.

CONCLUSIONS OF LAW

One of the basic rules of contract law is that when seeking parties' intent from several documents, an earlier agreement will be rejected for a later expression that is final. See, e.g., J. Calamari & J. Perillo, The Law of Contracts § 3-2 (3d ed. 1987). To the extent that the June 14 "Lease Agreement" was the last expression of the parties' intent, it must control the terms of their agreement.

But while the "Lease Agreement" serves as a a full and final expression of the parties' intent about some issues, including the identity of the parties to be bound by the contract, it is clearly lacking several terms. In this respect the "Lease Agreement" is a partially rather than a fully integrated expression of the parties' agreement. Restatement (Second) of Contracts § 210 cmt.c (1981); see also New Eng. Educ. Training Serv. v. Silver St. P'ship, 156 Vt. 604, 609–10 (1991). This is notwithstanding the fragment of what is presumably paragraph 13 of the "Lease Agreement" averring to the contrary.

4

For those missing terms (paragraphs 4–13), we look to the June 10 "Sublease Agreement," which the evidence shows to contain a version of the missing terms consistent with the parties' intent for the final version. Thus, when the two leases are read in conjunction, a full lease is created with the "Lease Agreement" controlling where terms conflict. Id.

In any contract or lease dispute, it always the duty of the court to understand the contracting intentions of the parties, and then apply it. In re Grievance of Verderber, 173 Vt. 612, 615 (2002) (mem.). Here, we conclude that the parties' intentions may fairly be discerned by reading the two agreement together. Cf. New Eng. Educ. Training Serv., 156 Vt. at 610. We are persuaded that the more reasonable reading of these two documents is that property-owner Chompupong intended to substitute individual, real persons, for the corporate entities and that was the main purpose of the second agreement. There is no question that there was a second document, and no real factual dispute that Plaintiff's Ex. 1 is that second document. Even if its middle pages are missing, it is sufficient to constitute persuasive evidence of intent to alter the four-day-earlier lease, by incorporating every non-inconsistent term of the former, together with explicitly noted changes, including a later due date for rent, which was advantageous to the tenant.

As to the addition of "Saigon Le, Inc." to the signature page, its appearance and import is ambiguous . Isbrandtsen v. North Branch Corp., 150 Vt. 575, 577 (1988) ("A provision in a contract is ambiguous only to the extent that reasonable people could differ as to its interpretation."). As an ambiguous term, we will look to both the contract and external evidence surrounding its formation. Investment Properties v. Lyttle, 169 Vt. 487, 498 (1999).

It is, first of all, not clear who added the three words. We can say that Mrs. Nguyen did not as the handwriting is inconsistent with hers; it appears to be written either with a different pen or by a person who bears down much more forcefully in writing. It is also unclear when the term was added to Mrs. Nguyen's signature. The three words are inconsistent with the first page, which is clearly cast in terms of individual "sublessors," the latter apparently an unfortunate and unintended holdover from an earlier version of the lease. If added at the behest of Mrs. Nguyen, to suggest a corporate execution, it is less than a clear statement of intent and at best ambiguous. If added by landlord Chompupong, it is against his interest.

We think the more persuasive interpretation of the corporate name is that it merely identifies Mrs. Nguyen as being affiliated with the company operating the restaurant, Saigon Le Inc. We are therefore not persuaded that it should be read as having been executed solely in a corporate capacity. Rather the evidence preponderates toward a conclusion of individual liability as both parties signed the agreement in their personal capacity, consistent with their stated intent. Thus, Mrs. Nguyen, as the tenant, is personally liable for the lease and her restaurant's breach of it.

A landlord seeking to recover unpaid rent, after tenant vacates, must show reasonable efforts to mitigate damage by reletting the premises. O'Brien v. Black, 162 Vt. 448, 451–52 (1994). Here, efforts toward such an end were halting, ineffectual, and, we conclude, less than the law would require. No one likes to pay real estate commissions, but even if they were to be twenty percent, landlord cannot refuse to pay them, and assign the resulting vacancy losses to his former tenant. The duty to mitigate is measured by reasonableness, id., and landlord's omissions through February of this year fail to measure up to that standard. We will therefore award rent only for the months of March 2005 through May 2005, at which

time this trial occurred.

Counsel for plaintiff to draw judgment, including costs.

Dated at Burlington, Vermont, _____, 2005.


_____
Judge