NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 39

No. 2020-207

| | |
|---|---|
| Earl Scott | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| State of Vermont | February Term, 2021 |

Timothy B. Tomasi, J.

David C. Sleigh of Sleigh Law, St. Johnsbury, for Plaintiff-Appellant.

Thomas J. Donovan, Jr., Attorney General, and Philip Back, Assistant Attorney General, Montpelier, for Defendant-Appellee.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1.     **EATON, J.**  Earl Scott appeals the trial court's grant of summary judgment to the State of Vermont concerning his claim for compensation under the Vermont Innocence Protection Act (VIPA).  We affirm.

¶ 2.     The following facts are undisputed for summary-judgment purposes.  In April 2010, Scott was charged with two counts of sexual assault against a person under the age of sixteen. Scott was twenty-two at the time the charges were filed.  The offenses were alleged to have occurred "sometime during 2003 or 2004."  Subsequently, Scott pleaded guilty to an amended charge of lewd and lascivious conduct with a child and was sentenced to two to five years' incarceration.  He began serving his sentence in January 2012.

¶ 3.    While in custody under sentence, Scott brought a claim for post-conviction relief (PCR) in civil court.  The claim was later amended to assert that the plea colloquy did not comply with the requirements of Vermont Rule of Civil Procedure 11(f) and that his criminal counsel was ineffective on several other grounds.  While the PCR claim was pending, Scott reached his maximum sentence date and was released in March 2016.

¶ 4.    In May 2016, the State conceded that Scott's plea colloquy did not comply with Rule 11 and that his conviction should be vacated, resulting in the remand of the prosecution to the criminal division.  Scott's counsel submitted a proposed order vacating the criminal conviction on June 22, 2016, providing Scott with a copy.

¶ 5.    Also, while the PCR claim was pending, Scott learned that he had not been given proper credit for good time and had therefore served time beyond his actual maximum release date. He made a claim seeking compensation for the time he remained in jail beyond that point.  On July 12, 2016, with knowledge that his criminal conviction was going to be vacated, Scott signed a general release of claims against the State in exchange for $40,000.

¶ 6.    The general release stated, in pertinent part:

## GENERAL RELEASE

For and in consideration of the sum of **Forty Thousand and No/100 DOLLARS ($40,000)**, lawful money of the United States, the receipt and sufficiency of which is hereby acknowledged, the undersigned Earl Scott, Jr. (**"Releasor"**) does for himself, his representatives, executors, guardians, administrators, successors, and assigns, hereby release and forever discharge the STATE OF VERMONT, along with its agencies, departments and political subdivisions (**"Releasees"**), and their employees, officers, directors, agents, adjusters, insurers, attorneys, contractors, representatives, administrators, successors and assigns, of and from any and all manner of action and actions, cause and causes of action, suits, damages, judgments, executions, claims for any and all personal injuries, pain and suffering, property damage, medical payments, civil rights violations, and demands whatsoever, in law or in equity, including any claims for attorneys' fees or costs, and any and all liens which **Releasor** had, now has or which hereafter he and/or his heirs, representatives, executors, insurers, administrators, successors, and assigns can, shall, or may have against **Releasees**

2

and their employees, officers, directors, agents, adjusters, insurers, attorneys, contractors, representatives, administrators, successors and assigns for, upon, or by reason of any matter, cause or thing whatsoever, from the beginning of the world up to the date of execution of this document, *and particularly*, but without in any manner limiting the foregoing, on account of all issues and claims for relief that could have been raised based on his term of incarceration commencing on January 5, 2012, and terminating on March 23, 2016, resulting from his conviction in the matter entitled State v. Earl Scott, Docket No. 182-4-10 Oscr. By this agreement, **Releasor** further extinguishes any unknown, undiscovered, and undiscoverable claims on behalf of himself or his successors, heirs, representatives or assigns, and all persons who could in any way be subjected to these claims, including principals, members, employees, agents, officers, shareholders and insurers.

¶ 7. Pursuant to the unopposed motion, the civil division vacated Scott's conviction. The matter was returned to the criminal division, where the State ultimately dismissed the charge.

¶ 8. Scott filed the instant action on August 30, 2018, seeking recovery from the State under the VIPA. That statute provides that "[a] person convicted and imprisoned for a crime of which the person was exonerated . . . shall have a cause of action for damages against the State." 13 V.S.A. § 5572(a). Scott argued that as he was not yet sixteen at the time of the conduct giving rise to the charges, his actions could not have been a crime because the criminal division did not have jurisdiction under the statutory scheme then in place. See In re D.K., 2012 VT 23, ¶ 13, 191 Vt. 328, 47 A.3d 347 ("[W]hether an individual is deemed to be a child subject to the jurisdiction of the family division depends on the offender's age at the time the delinquent act was committed, not at the time that the offender was charged.").

¶ 9. The State moved for summary judgment, arguing that the general release barred Scott's claim. And even if it did not, the State contended, he was not entitled to relief because he did not meet two preconditions to recovery under the VIPA: he was not "actually innocent," see 13 V.S.A. § 5574(a)(3) (requiring claimant to establish he "is actually innocent of the felony or felonies that are the basis for the claim"), and he either fabricated evidence or committed perjury during proceedings related to the charged offense, see id. § 5574(a)(4) (requiring claimant to

establish he did not fabricate evidence or commit or suborn perjury during proceedings related to crime as condition of judgment). In ruling on the motion, the court held that the language of the release was unambiguous, and that it plainly operated to preclude Scott's claim. The court also determined that, even setting aside the general release, plaintiff's action could not proceed because he did not meet the VIPA's actual-innocence requirement. It did not reach the State's alternative argument that plaintiff had either fabricated evidence or perjured himself, otherwise defeating his VIPA claim.

¶ 10. Scott appeals, arguing that the terms of the general release do not preclude his VIPA claim, or, in the alternative, public-policy principles void the release. He maintains that he is entitled to recovery under the VIPA because he can demonstrate actual innocence and did not fabricate evidence or commit perjury during related proceedings.

¶ 11. We review a trial court's ruling on a motion for summary judgment de novo, applying the identical standard. Pettersen v. Monaghan Safar Ducham PLLC, 2021 VT 16, ¶ 9, __ Vt. __, __ A.3d __. Under this familiar metric, the moving party is entitled to summary judgment upon a showing that there is no genuine dispute of material fact and that judgment is appropriate as a matter of law. V.R.C.P. 56(a). Here, the material facts are not at issue for purposes of the summary-judgment motion; rather, the questions posed in this case turn on matters of law—interpretation of both the general release and the provisions of the VIPA.

¶ 12. A release is interpreted, like all contracts, with the goal of effectuating the parties' intent. N. Sec. Ins. Co. v. Mitec Elecs., Ltd., 2008 VT 96, ¶ 20, 184 Vt 303, 965 A.2d 447; Economou v. Economou, 136 Vt. 611, 619, 399 A.2d 496, 500 (1979). When the language of a release is clear, we presume it reflects that intent. N. Sec. Ins. Co., 2008 VT 96, ¶ 20. Releases must be specific to be valid, and as a general matter are interpreted narrowly. Id. Where the language is ambiguous, extrinsic evidence—also called "parol evidence"—may be brought to bear in interpreting it. Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 577-78, 556 A.2d 81, 83-84 (1988).

4

¶ 13. A similar principle governs our interpretation of statutes: our purpose is to discern and give effect to the Legislature's intent, and where a provision is clear, we assume it reflects that intent. Northfield Sch. Bd. v. Washington S. Educ. Ass'n, 2019 VT 26, ¶ 13, 210 Vt. 15, 210 A.3d 460. Only where a statute's language is ambiguous will we invoke canons of statutory interpretation to aid in determining legislative intent. Id.

¶ 14. Scott maintains that the general release either does not or should not bar his claim for several reasons. First, he contends that, read narrowly and in context, the release does not encompass the instant cause of action. On this point, he also suggests that the intent underlying the release is better understood with reference to extrinsic evidence of the circumstances surrounding its execution. Alternatively, Scott argues that the release is void as a matter of public policy: first, because manifest injustice would arise from barring a claim which had yet to accrue at the time the release was executed; and second, because he was neither given written notice of the potential for a claim under the VIPA prior to the vacatur of his conviction, nor did he execute a release which was specific to the statute. We take up Scott's contractual-interpretation argument before turning to considerations of public policy.

¶ 15. We find the release's plain language unambiguous. Scott agreed to forgo "any and all manner of action and actions . . . in law or in equity" which he "can, shall, or may have" against the State "for, upon, or by reason of any matter, cause or thing whatsoever" particularly—but not limited to—"on account of all issues and claims for relief that could have been raised based on his term of incarceration . . . resulting from his conviction" in the underlying criminal case. He "further extinguishe[d] any unknown, undiscovered, and undiscoverable claims." As we held in Northern Security Insurance Co. v. Mitec Electronics, Ltd., a contract which contains language releasing all claims a party " 'can, shall, or may have' . . . plainly refers to the future, and to claims [the defendant] or its successors 'may have' but which were not known at the time of the release," thus unambiguously drawing within its reach "future claims arising out of events . . . that occurred

5

before the release." 2008 VT 96, ¶ 24 (concluding that general release containing this language barred future claims unknown at time of contracting but arising from events that occurred before release was signed). This was so even though that release—unlike the one at issue here—did not explicitly refer to "unknown or future claims." Id. It is therefore even clearer than it was in Northern Security Insurance Co. that this language unambiguously releases future claims arising from Scott's incarceration, even if they were uncontemplated at the time the release was executed.

¶ 16. However, Scott argues that future statutory or VIPA claims were not expressly mentioned in the release, and that this omission reflects an intent to exclude such actions from the universe of claims he released. In support of this contention, he cites Investment Properties, Inc. v. Lyttle, a case in which we explained that, because the validity of a release is contingent on its specificity, its language "should be narrowly interpreted, and if the parties did not include certain terms this should be interpreted as intentional exclusion of those terms." 169 Vt. 487, 497, 739 A.2d 1222, 1229 (1999).

¶ 17. In Investment Properties, however, "the language of the document alone d[id] not reveal the precise scope of the release." Id. This was so because although the effect of the release was "confined to 'design, installation and maintenance' " of a concrete subfloor, it also "include[d] broad language to bar any claim 'related to' deficiencies in the . . . subfloor." Id.; see also Isbrandtsen, 150 Vt. at 577, 556 A.2d at 83 (explaining contractual provision is ambiguous where "reasonable people could differ as to its interpretation"). Given this ambiguity, it was unclear whether the release barred claims stemming from a later, unsuccessful attempt to remedy the subfloors' deterioration by coating them with another material; that act did not fit neatly into the categories of design, installation, or maintenance. Inv. Props., Inc., 169 Vt. at 497, 739 A.2d at 1229. We found that this lack of clarity rendered the release's construction a factual question, and held that the trial court's determination as a matter of law was therefore error. Id. at 498, 739 A.2d at 1230.

6

¶ 18.  The comparison finds no footing here.  We first note that the general release's explicit reference to claims "in law or in equity" belies Scott's assertion that it includes no reference to statutory claims.  What remains, then, is his argument that the lack of any reference to the VIPA specifically should be construed to mean the parties did not intend to release claims arising thereunder.  We do not agree.  Unlike the Investment Properties release, where claims arising from the failure of the flooring remedy were arguably not encompassed by a release of all potential actions relating to "design, installation, and maintenance" of the subfloor, but also clearly "related to deficiencies" in the subfloor, the terms of the release Scott signed are not internally inconsistent or ambiguous.  At no point does the language of the release suggest that it is limited to a particular category of claims arising from Scott's incarceration; rather, its language uniformly releases all such claims.

¶ 19.  Further, despite its breadth, the release does not lack specificity, as was also the case in Investment Properties.  Breadth and specificity are not mutually exclusive, and courts do not require the parties to a general release to identify and specifically forswear any and all potential claims arising from a given transaction or occurrence—in fact, such a requirement would be at odds with the very concept of a general release.  See General Release, Black's Law Dictionary (11th ed. 2019) ("A broad release of legal claims that is not limited to a particular claim or set of claims, such as those at issue in a pending or contemplated lawsuit, but instead covers any actual or potential claim by the releasing party against the released party based on any transaction or occurrence before the release.").

¶ 20.  Finally, we reject Scott's suggestion that extrinsic evidence of the facts and circumstances surrounding the execution of a release is admissible for purposes of determining his intent.  Although courts may "consider the circumstances surrounding the making of [an] agreement" in a threshold determination of ambiguity, such ambiguity exists only where "a writing in and of itself supports a different interpretation from that which appears when it is read in light

7

of the surrounding circumstances, and both interpretations are reasonable." Isbrandtsen, 150 Vt. at 579, 556 A.2d at 84. Scott alleges that he signed the release with the understanding that the $40,000 settlement he received from the State was compensation only for the nine months he served in excess of his sentence as adjusted for good-time credit. But his understanding of the purpose of that payment has no bearing on the scope of the claims he released in return; in other words, this circumstance does not support a different interpretation than the release's plain language. Because the document is unambiguous, the extrinsic evidence Scott cites is not appropriately subject to further consideration. See id. at 577-78, 556 A.2d at 83-84 (holding courts may consider extrinsic evidence only where contract is ambiguous).

¶ 21. In short, the clear language employed in the general release leaves us with no doubt but that Scott, in exchange for $40,000, released any and all claims arising from his incarceration for lewd and lascivious conduct with a child—including those which, like the instant claim, were not yet ripe at the time he signed the release. Having determined that the plain language of the release forecloses Scott's claim under the VIPA, we now address his argument that we should nonetheless decline to enforce it as contrary to public policy.

¶ 22. The law has long recognized that courts have the power to void even clear, unambiguous written contracts that contravene public policy in either their terms or contemplated performance. LoPresti v. Rutland Reg'l Health Servs., Inc., 2004 VT 105, ¶ 19, 177 Vt. 316, 865 A.2d 1102; Dalury v. S-K-I, Ltd., 164 Vt. 329, 332, 670 A.2d 795, 797 (1995). To invoke this power, however, the moving party must show that enforcement of the contract would be either "cruel or shocking to the average [person's] conception of justice" or "injurious to the public or against the public good." Dutch Hill Inn, Inc., v. Patten, 131 Vt. 187, 192, 303 A.2d 811, 814 (1973) (quotations omitted). Scott argues that enforcement of the general release would contravene public policy because (1) the release of a claim which had yet to accrue at the time the

8

document was executed would be manifest injustice; and (2) the VIPA's requirements regarding notice and specificity of a release of wrongful-incarceration claims were unmet.[1]

¶ 23. We find no merit in plaintiff's argument that because his VIPA claim had not accrued at the time he executed his agreement with the State, its release is void for public-policy reasons. On this point, Scott relies heavily on Chubb v. Amax Coal Co., a 1984 case from an intermediate Illinois court in which a release was construed, on public-policy grounds, not to bar claims for an unrelated injury which were not contemplated by the parties at the time of contracting. 466 N.E.2d 369, 373 (Ill. Ct. App. 1984) (so holding because "the plaintiff, upon re-employment, should not be denied coverage based upon the fortuitous circumstance that this coverage was provided by the same group policy under which he had released his prior claim"). Scott argues that Chubb stands for the proposition that "it would be against public policy to remove all protection of the law between the parties as to their future, uncontemplated conduct." Significantly, however, the conduct forming the basis of Scott's claim—his prosecution as an adult for an act that he committed while under the age of sixteen—had already occurred and was certainly known to him at the time he executed the release. And as Scott acknowledges, Chubb considered the "specific context of disability insurance," and based its determination on "the nature of a group insurance policy as a blanket policy covering all employees who come within its eligibility requirements." Id. It has no particular relevance to the facts of Scott's case, and we do not find its holding persuasive.

¶ 24. Further, as set forth supra, ¶ 15, it is well established that a release may bar claims which had yet to accrue at the time of its execution. We recognized in Northern Security Insurance

---

[1] As the State points out, plaintiff did not present these arguments below. We generally will not entertain an argument on appeal which was not preserved in the trial court. V.R.A.P. 3(a) ("An appeal from a judgment preserves for review any claim of error in the record."). However, to dispel any remaining illusions about the efficacy of contractual releases such as the one here, we address Scott's public policy argument. V.R.A.P. 2 ("[T]he Supreme Court may . . . suspend any provision of these rules in a particular case.").

Co. that verbiage of the type employed here is commonly utilized to release claims arising from a specified event, even if all elements of those claims do not exist yet at the time of the release; we affirmed that in interpreting such releases, we will effectuate that intent.  2008 VT 96, ¶ 23.  The ubiquity of provisions such as this one undercuts the suggestion that the average person would find it so "cruel or shocking" to his or her conception of justice as to invoke public-policy concerns.  See Dutch Hill Inn, Inc., 131 Vt. at 192, 303 A.2d at 814.

¶ 25.  Moreover, public policy "strongly favors settlement of disputed claims without litigation" so as to "encourage compromise between the adverse parties before resorting to the judicial system to resolve disputes."  Id.; see also Anderson v. State, 147 Vt. 394, 396, 518 A.2d 360, 361 (explaining that release generally bars recovery "unless something in its terms indicates a contrary intention" because "[s]uch compromises of disputed liability by parties fully cognizant of the facts and issues are not only valid, but favored as a matter of public policy").  And in fact, in crafting the VIPA, the Legislature explicitly contemplated the potential to release claims arising under the statute, taking care to underscore the efficacy and finality of such an agreement.  13 V.S.A. § 5574(d) (explaining that claimant's written "acceptance of a damages award, compromise, or settlement as a result of a claim under this subchapter . . . shall be final and conclusive on the claimant, and constitute a complete release . . . of any claim against the State and a complete bar to any action by the claimant against the State with respect to the same subject matter").  Thus, although Scott is correct in pointing out that the purpose of the VIPA is to compensate persons convicted and imprisoned for crimes of which they are later exonerated, the Legislature also took care to provide that such persons could freely alienate their claims in exchange for consideration from the State.  See id. §§ 5572(a), 5574(d).

¶ 26.  As we have repeatedly observed, "the power to declare a contract void because it violates public policy is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."  Theberge v. Theberge, 2020

10

VT 13, ¶ 19, __ Vt. __, 228 A.3d 998 (quotations omitted); see also Barrett v. Carden, 65 Vt. 431, 434, 26 A. 530, 531 (1893) (explaining courts should be cautious in relying upon public policy, as "it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never urged at all but when other points fail." (quotation omitted)). Given the pervasive and enforceable nature of general releases disclaiming causes of action yet to mature at the time the release is signed, see N. Sec. Ins. Co., 2008 VT 96, ¶ 24, the Legislature's explicit contemplation of the fact that a VIPA remedy may be released, see 13 V.S.A. § 5574(d), and public policy's strong preference for the settlement of claims, we cannot conclude that Scott has met his burden of demonstrating that enforcement of the general release would be either "cruel or shocking to the average [person's] conception of justice" or "injurious to the public or against the public good." Dutch Hill Inn, Inc., 131 Vt. at 192, 303 A.2d at 814 (quotations omitted).

¶ 27. As an alternate ground to void the release for public-policy reasons, Scott points to two procedural provisions of the VIPA which he alleges were contradicted here. By couching these arguments in public-policy analysis, Scott implicitly concedes that, even if the procedures followed in this case failed to satisfy the VIPA's terms, the statute provides no independent remedy for such violation. In any event, we find neither provision relevant here, either by its terms or by analogy to considerations of public policy.

¶ 28. First, Scott looks to 13 V.S.A. § 5577, which provides that a copy of subchapter 2 of the VIPA—dealing with compensation for wrongful convictions—shall be provided to a person by a court "exonerating [that] person pursuant to subchapter 1 of this chapter through vacating or reversing the person's conviction, dismissing the information or indictment, [or] entering judgment on an acquittal after a second or subsequent trial." Id. § 5577(a)(1). Because subchapter 1 of the VIPA applies to persons exonerated by postconviction DNA testing, Scott's circumstances are clearly not encompassed by this provision. See id. §§ 5561-5570. Had the Legislature intended

for a copy of subchapter 2 of the VIPA to be provided to any person whose conviction is vacated by a court for any reason whatsoever, it could have so required using similar language. See Town of Milton Bd. of Health v. Brisson, 2016 VT 56, ¶ 24, 202 Vt. 121, 147 A.3d 990 ("Where the Legislature has demonstrated that it knows how to provide explicitly for the requested action, we are reluctant to imply such action without legislative authority.") (quotation omitted)). It did not.

¶ 29.    We cannot find the free and voluntary release of any claim under the VIPA which is not based on DNA evidence void based on the argument that the Legislature should, as a matter of public policy, have required that such persons receive notice of the VIPA. As this Court has long recognized,

> it must not be forgotten that you are not to extend arbitrarily those rules that say that a given contract is void as being against public policy, because if there is one thing more than another that public policy requires, it is that [persons] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and be enforced by courts of justice; wherefore you have this paramount public policy to consider, that you are not lightly to interfere with this freedom of contract.

Osgood v. Cent. Vt. R.R. Co., 77 Vt. 334, 343-44, 60 A. 137, 140 (1905) (quotation omitted). Scott's argument falls far short of the showing required to void the general release on public policy grounds.

¶ 30.    The second such argument fails for the same reason. Scott points to 13 V.S.A. § 5574(d), discussed supra, ¶ 25, which provides that a claimant's acceptance of a "settlement as a result of a claim under this subchapter shall be in writing." (Emphasis added.) He argues that this language required the execution of a "statute-specific release." Again, it is difficult to understand why the want of language specifically invoking the VIPA would undermine legislative intent, because the VIPA only requires a release of a claim made under it to be in writing, which was satisfied by the release Scott executed here. Even assuming the VIPA applies here, the release he executed complied with § 5574(d)'s requirement of a written release and it was not necessary

to refer to the VIPA for the general language of the release to apply to claims which existed or which might in the future exist pursuant to the VIPA. The VIPA statutory release requirements are satisfied because the general release was in writing.

¶ 31.    Indeed, given the subsection's remaining requirements—that such a written release, where not procured by fraud, "shall be final and conclusive on the claimant and constitute a complete release . . . of any claim against the State and a complete bar to any action . . . against the State with respect to the same subject matter," id., we are at a loss to understand how enforcing the release could, as Scott argues, directly undermine Legislative intent and thwart the aims of the VIPA. Again, we are not convinced that enforcement of the general release would be either "cruel or shocking to the average [person's] conception of justice" or "injurious to the public or against the public good." Dutch Hill Inn, Inc., 131 Vt. at 192, 303 A.2d at 814 (quotations omitted).

¶ 32.    In sum, the terms of the general release both encompass Scott's VIPA claim and do not contravene public policy. They therefore apply to bar Scott's claim. The trial court correctly granted summary judgment to the State on this basis. As a result, we need not reach the State's alternative argument that Scott cannot bring a meritorious claim under the VIPA, either because he cannot demonstrate his actual innocence or because he fabricated evidence or perjured himself in related proceedings.

Affirmed.

FOR THE COURT:

_____

Associate Justice


¶ 33.    **ROBINSON, J., concurring in result only.**    The majority's application of the broad general release that arose from plaintiff's "good time credit" claim to bar his claim under the Vermont Innocence Protection Act (VIPA) runs afoul of the statutory parameters for release

13

of VIPA claims. For that reason, I cannot join the majority's analysis. I join the majority in affirming because I would affirm the trial court's dismissal on alternate grounds.[2]

¶ 34. The VIPA specifically deals with settlements, and says the following:

> The claimant's acceptance of a damages award, compromise, or settlement <u>as a result of a claim under this subchapter</u> shall be in writing and, except when procured by fraud, shall be final and conclusive on the claimant, and constitute a complete release by the claimant of any claim against the State and a complete bar to any action by the claimant against the State <u>with respect to the same subject matter</u>.

13 V.S.A. § 5574(d) (emphasis added). The statute does not merely require that a release be in writing in order to effectively bar a future claim under the VIPA; rather, it requires that a settlement "of a claim under [the VIPA]" be in writing, and provides that such a written settlement bars any future claims against the State "with respect to the same subject matter." <u>Id</u>. The majority's application of the release in this case runs afoul of both directives.

¶ 35. First, as the majority acknowledges, the settlement and release in this case did not come about "as a result of a claim under this subchapter"— or at least the facts in the record viewed in the light most favorable to plaintiff do not support that inference. <u>Id</u>. The release itself makes no mention of the potential VIPA claim, and the only evidence the State proffered in support of this proposition is that plaintiff knew that his conviction was going to be vacated at the time he signed the release. Although the release is in writing, undisputed evidence does not support the conclusion that it is a writing that came about as a result of a VIPA claim.

¶ 36. Even if the statute did not require that the writing document a settlement "as a result of a claim under this subchapter," implicit in the requirement that an effective settlement of a VIPA claim be in writing is a requirement that <u>the VIPA claim</u> be the subject of the writing. The

---

[2] In particular, 13 V.S.A. § 5574(a)(3) requires a VIPA claimant to show that he "did not engage in any illegal conduct alleged in the charging documents for which he . . . was charged, convicted, and imprisoned." The conduct plaintiff engaged in here, although not criminal because he was a juvenile, was nevertheless illegal.

14

Legislature specifically sought to ensure, through a writing requirement, that an individual with a VIPA claim had clear notice of the effect of a settlement and release of a VIPA claim—something that is not present when the settlement is for a different claim and the release is not tied to the VIPA claim.

¶ 37.     Second, even when a release is enforceable to extinguish a VIPA claim, and any other claims against the State arising from the same core of facts, the effect of the release in barring future claims is limited to claims "with respect to the same subject matter." Id.  In the VIPA context, the Legislature has not endorsed the broad application of an unrestricted general release to bar future claims of any sort; it has limited the bar effectuated by the release to claims arising from the same subject matter. Id.

¶ 38.     Because the Legislature has expressly defined in the context of the VIPA the circumstances under which a settlement and release can operate to bar future claims, and because this settlement and release do not satisfy the statutory requirements, I believe enforcement of the broad general release of a different claim to preclude plaintiff's VIPA claim would run afoul of the VIPA.  For that reason, I conclude the release cannot bar plaintiff's VIPA claim.  See Thompson v. Hi Tech Motor Sports, Inc., 2008 VT 15, ¶ 13, 183 Vt. 218, 945 A.2d 368 (looking to statutes to define existence and scope of public policy in considering whether to override provisions in broad release).

_____
Associate Justice

15