2012 VT 43

# Frank Hall v. State of Vermont

[54 A.3d 993]

No. 10-457

Present: Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Kupersmith, Supr. J., Specially Assigned

Opinion Filed June 22, 2012

Motion for Reargument Denied July 20, 2012

64

*Edwin L. Hobson*, Burlington, and *John Archer Hobson*, Portland, Maine, for Plaintiff-Appellee/Cross-Appellant.

*William H. Sorrell*, Attorney General, and *Keith Aten*, Assistant Attorney General, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Plaintiff Frank Hall, a longtime employee of the State of Vermont Agency of Transportation (AOT), sued his employer in the fall of 2007, alleging discrimination on the basis of, among other things, a physical disability and retaliation for his having filed a workers' compensation claim. The jury found no disability discrimination, but awarded Hall damages based upon its finding that the State had retaliated against him as alleged. On appeal, the State argues that: (1) Hall's retaliation claim was precluded by a September 2003 Stipulation and Agreement signed by Hall and AOT releasing the State from liability for any and all claims associated in any way with Hall's reclassification and transfer stemming from hostile work environment allegations against him; (2) Hall's retaliation claim was not supported by any causal connection linking his employment reclassification and transfer with his having filed a workers' compensation claim; (3) evidence of a video surveillance of Hall connected with a second workers' compensation claim was insufficient as a matter of law to support his retaliation claim and the resulting damages award; and (4) even if the record supports Hall's retaliation claim, the State's liability is limited to $250,000, as set forth in Vermont's Tort Claims Act during the relevant time period.[1] Hall cross-appeals, challenging the trial court's denial of his request for post-judgment interest and attorney's fees. We vacate the judgment against the State and remand the matter for the trial court to rule on the potentially determinative issue of the scope of the September 2003 release.

¶ 2. Hall has been employed by AOT since 1970. In 1990, he became supervisor of the Williamstown garage. In April 2002, Hall suffered an injury to his right knee and filed a claim for workers' compensation. The State accepted the claim, and he underwent

---

[1] Effective July 1, 2011, the relevant statute was amended to increase the limit to $500,000. See 12 V.S.A. § 5601(b).

physical therapy and arthroscopic surgery, but the knee continued to deteriorate. A little over a year later, in June 2003, Hall was placed on paid administrative leave pending an investigation into claims brought by a female employee supervised by Hall alleging that Hall had created a hostile work environment. An investigation ensued.

¶ 3. As a result of the investigation, in September 2003 AOT and Hall, with the assistance of counsel, negotiated a resolution of the allegations against him and signed a Stipulation and Agreement. That Agreement set forth preliminary information stating that there had been an investigation into allegations of Hall creating a hostile work environment and that the parties wished to settle and compromise all claims and thereby avoid the risks of litigation. The Agreement also stated that it did not contain admissions of wrongdoing or contractual violations by either party and that it was supported by consideration in the form of promises and obligations as set forth in the document.

¶ 4. Pursuant to the Agreement, AOT reclassified Hall's job from Transportation Area Maintenance Supervisor to Transportation Maintenance Worker IV (and Hall was later transferred from the Williamstown garage to the North Montpelier garage). The parties agreed that the reclassification would be considered an administrative action and not a disciplinary action and that Hall's salary would not be reduced. Further, AOT agreed to take no further action against Hall as a result of the hostile work environment investigation. Hall certified that he had consulted with legal counsel prior to signing the Agreement and that the Agreement was voluntary.

¶ 5. The critical release provision contained in the Agreement states as follows: "Frank E. Hall hereby waives any grievance, complaint, lawsuit, or other claim of legal wrongdoing or liability whatsoever against the State of Vermont, . . . associated in any way with his employment by the State of Vermont, the negotiation of this Agreement, and his reclassification as called for in this Agreement." Hall's attorney, former counsel for the Vermont State Employees Association, spent forty-five minutes alone with Hall going over the Agreement before signing it along with Hall. Based on his review of the Agreement, the attorney insisted on adding to the end of the above-quoted sentence the following language: "specifically pertaining to the aforesaid 'hostile work environment' as stated, supra." At trial, the attorney testified that he added the

language because he wanted to make sure that the release would be limited to matters surrounding the hostile work environment allegations and would not preclude unrelated future claims.

¶ 6. In December 2003, Hall filed a second workers' compensation claim based on further deterioration of his knee. The State accepted the claim and, in February 2004, his orthopedic surgeon replaced his right knee with an artificial knee. In May 2004, while Hall was recuperating on leave, his supervisor asked the workers' compensation division to conduct an investigation into Hall's claimed disabled condition. As a result of this request, the division did a video surveillance of Hall's activities in public on a single day.

¶ 7. Eventually, AOT determined that Hall could no longer perform the duties of Transportation Maintenance Worker IV and suggested retraining. Hall disputed this determination and petitioned AOT's Reasonable Accommodations Committee (RAC). RAC ruled that Hall could not perform all of the essential functions of the job, even with accommodations. Hall was reassigned as a finance technician, a job that does not ordinarily involve overtime pay and therefore resulted in a reduction in income.

¶ 8. In December 2008, Hall filed a consolidated amended complaint against the State of Vermont. He cited several bases for invalidating the release provision in the September 2003 Agreement signed by the parties, including mutual mistake, failure of consideration, and duress. He claimed age and disability discrimination based on AOT's failure to provide reasonable accommodations for his disability. He also claimed that the State had discriminated against him for his having opposed discriminatory policies against female employees. He further alleged that AOT had retaliated against him because of his injury, his having filed for workers' compensation coverage, and his having opposed the State's unlawful and discriminatory policies. Finally, he claimed that the State had violated Vermont's Fair Employment Practices Act and Open Meeting Law and had unconstitutionally restricted his freedom of speech.

¶ 9. In its answer, the State denied each of the allegations and raised several affirmative defenses, including sovereign immunity, failure to mitigate damages, accord and satisfaction, payment and release, and waiver and estoppel. At trial, the court allowed the jury to consider only two of Hall's claims — the disability discrimination claim and the claim of retaliation for having sought

workers' compensation coverage. The jury rejected the disability discrimination claim,[2] but found liability and damages based on the retaliation claim. The jury awarded Hall front and back pay damages of $406,567, and emotional distress damages of $87,000. This appeal followed.

¶ 10. We first address the State's claim that the judgment should be reversed because the Agreement signed by Hall and his attorney resolved the hostile work environment allegations made against him and released the State from any claims of legal wrongdoing with respect to the reclassification[3] that resulted from those allegations. We conclude that the trial court's failure to resolve the critical question of whether Hall waived any claim of legal wrongdoing or liability against the State by entering into the Agreement requires us to vacate the jury verdict and remand the matter for resolution of this issue. The procedural history of the issue follows.

¶ 11. As noted, Hall cited rescission as a cause of action in his complaint, alleging that he entered into the Agreement involuntarily as the result of misleading statements made by the State representatives, and further that the Agreement was invalid because of a failure of consideration, mutual mistake, and duress. In its answer, the State denied these claims and asserted several affirmative defenses based on the Agreement, including accord and satisfaction and payment and release.

¶ 12. Hall was the first witness at trial. During direct examination, his trial counsel questioned him about the Agreement and introduced it as an exhibit. The attorney who had represented Hall at the time he signed the Agreement testified as to the circumstances surrounding the negotiation and execution of the Agreement. After Hall finished presenting his direct evidence, the State moved for judgment as a matter of law, pursuant to Vermont Rule of Civil Procedure 50, on both the discrimination and retaliation claims. In pertinent part, the State argued that Hall had waived his discrimination and retaliation claims by signing the Agreement in which he waived the right to bring "any

---

[2] In addition to determining that the State did not discriminate against Hall by failing to provide reasonable accommodations, the jury also determined that Hall would not have been able to perform the essential functions of his job even with reasonable accommodations.

[3] The "reclassification" discussed in the Agreement was, in fact, a demotion from a supervisory position to the position of Transportation Maintenance Worker IV.

grievance, complaint, lawsuit or other claim of legal wrongdoing or liability whatsoever against the State of Vermont" associated with "his reclassification as called for in this Agreement."

¶ 13. The trial court granted the State's motion for judgment as a matter of law as to Hall's age discrimination claim and his claim of retaliation for engaging in activities protected by the Vermont Fair Employment Practices Act. But the court denied the motion as to Hall's claims that the State failed to accommodate his disability and retaliated against him for filing a workers' compensation claim.

¶ 14. The court announced that it was deferring a ruling on the State's motion for judgment as a matter of law on the question of whether Hall had waived any claims against the State by signing the Agreement, stating that it needed time to carefully review the motion. The court invited the State to renew its Rule 50 motion at the conclusion of the trial before the case went to the jury, noting that it would "make a decision at that time." At the start of trial the next day, the court reiterated this point, stating that the "issue is more involved than I had time to resolve on short notice, so I am going to defer that issue to consider later, and [at] this time let the question stay in the case."

¶ 15. Upon the close of evidence, and before the court presented its instructions to the jury, the State renewed its Rule 50 motion. The State reasserted its argument that Hall's voluntary and knowing signing of the Agreement upon the advice of counsel released the State from any liability based on his claim that the State had retaliated against him for having filed a workers' compensation claim by demoting him following an investigation into hostile work environment allegations against him. In response, the court stated only: "Same ruling as before." The case then went to the jury.

¶ 16. After the jury announced its verdict, the State moved to set aside the verdict on the grounds that the Agreement precluded Hall's retaliation claim and that the evidence of retaliation for filing a workers' compensation claim was insufficient to go to the jury. Acknowledging that it had deferred ruling on the scope of the release, the court entered judgment based on the jury's verdict but allowed the parties more time to file supplemental memoranda on the motion to set aside the verdict. The State filed a renewed motion for judgment as a matter of law, asserting, among other things, that the Agreement barred Hall from arguing

that the State had no legitimate, nondiscriminatory reason for his reclassification because the circumstances demonstrated that Hall had voluntarily and knowingly entered into the Agreement, which plainly required him to waive any claims based on his reclassification as the result of the hostile work environment investigation. In response, Hall argued that the Agreement was ambiguous and that the State had waived any reliance on the release contained in the Agreement. According to Hall, the State had conceded the Agreement's ambiguity by allowing parol evidence of the handwritten addition to the release language to be admitted into evidence without objection.

¶ 17. Ruling on the post-trial motion, the trial court noted that the only potential adverse employment actions supported by any evidence offered on the claim of retaliation were Hall's demotion in 2003 (the reclassification and transfer) and the 2004 video surveillance. In response to the State's argument that the verdict could not stand because Hall had agreed to the reclassification as part of a voluntary settlement, the court ruled that the question of "waiver" was a fact issue for the jury to decide. According to the court, "[b]ecause the State never asked to present this defense to the jury for resolution, the court would normally conclude that the State has waived the claim." Citing *Silva v. Stevens*, 156 Vt. 94, 110, 589 A.2d 852, 861 (1991),[4] the court opined that Vermont Rule of Civil Procedure 49 would allow it to make a finding on an issue that was omitted in the special interrogatories to the jury. It therefore asked the parties to brief the issue of whether the Rule 49 provision was applicable here.

¶ 18. In its response, the State argued that the court could decide the issue and should determine that the Agreement was a valid release waiving Hall's claim that his reclassification was retaliation for his having filed a workers' compensation claim. The State asserted that AOT had agreed not to take any further disciplinary action against Hall in exchange for Hall waiving any claim against AOT for legal wrongdoing or liability associated with Hall's reclassification. According to the State, the Agreement offered Hall a reclassification without loss of pay grade instead of a disciplinary proceeding as a way of resolving the investigation

---

[4] V.R.C.P. 49(a), titled Special Verdicts, reads in part: "As to an issue omitted without such demand [for submission to the jury by a party] the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

into allegations that he had created a hostile work environment. In the State's view, Hall's contention that the hostile work environment allegations were a pretext, not a legitimate nondiscriminatory reason for his reclassification, was "exactly the sort of challenge . . . that Hall released and waived in the Stipulation and Agreement." The State pointed out that Hall was represented by legal counsel who reviewed the Agreement with him and added clarifying language.

¶ 19. In a November 2010 decision, the trial court ruled that "because the issue [regarding the alleged preclusive effect of the Agreement] did not go to [Hall's] claims but was instead an affirmative defense raised by the State, the failure to seek an instruction on the issue is most equitably treated as a waiver of the claim by the State." Curiously, the court relied upon two cases, in one the dissenting opinion, stating only the general proposition that a new issue cannot be injected into a case for the first time following trial. See *World Wide Agency, Inc. v. C.I.R.*, 42 T.C.M. (CCH) 617 (1981); *Grant v. Elder*, 170 P. 198, 207 (Colo. 1917) (Teller, J., dissenting). The court then entered a revised judgment deleting the award of costs and denying Hall's motion for attorney's fees.

¶ 20. Normally, on appeal from a post-trial motion for judgment as a matter of law and for a new trial, this Court is required to view the evidence in the light most favorable to the nonmoving party. *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122, 730 A.2d 1086, 1090 (1999). In this case, however, following the jury verdict the court ruled that the State had waived its affirmative defense based on the Agreement. On appeal, the State contends that the trial court erred in so ruling and that the Agreement precluded Hall's retaliation claim. Hall responds that there was substantial evidence of retaliation after the date the release was signed and that the State's failure to object to "pre-September 20, 2003 evidence" precludes any argument that the jury could not have considered that evidence. These responsive arguments do not directly address the State's primary argument on appeal. The question is whether, by signing the Agreement, Hall waived the retaliation claim that went to the jury.

¶ 21. When construing a written agreement — whether it be a deed, a lease, a contract, or some other written document — "the master rule is that the intent of the parties governs." *Main*

*Street Landing, LLC v. Lake St. Ass'n,* 2006 VT 13, ¶ 7, 179 Vt. 583, 892 A.2d 931 (mem.) (quotation omitted). In discerning the intent of the parties, the court must consider the written document as a whole. *Id.* "The court may consider limited extrinsic evidence of circumstances surrounding the making of the agreement in determining whether the writing is ambiguous, which is a question of law" for the court in the first instance. *Id.* (quotations omitted). Interpretation of the parties' intent becomes a question of fact for the factfinder only if the court has made the initial determination that the written document is ambiguous. *Id.*; see *Inv. Props., Inc. v. Lyttle,* 169 Vt. 487, 498, 739 A.2d 1222, 1229 (1999) ("While the construction of a release or contract is normally a question of law, when the language of the document is ambiguous and must be clarified by reference to external evidence, construction becomes a question of fact.").

¶ 22. Here, the September 2003 Agreement specifically states that Hall waived any claim against the State "associated in any way with . . . his reclassification as called for in this Agreement." The State maintains that the removal of Hall's supervisory authority was necessary to resolve issues in the workplace that led to the hostile work environment allegations and investigation. Hall counters that the State's reasons for reclassifying and transferring him were pretextual. He maintains that the hostile work environment claims were bogus and that the real reason for the reclassification was retaliation for his having filed a workers' compensation claim in April 2002.

¶ 23. But alleged disparate motivations do not an ambiguity make. The question is whether the language of the document was ambiguous as to Hall's waiver of his retaliation claim. The trial court never ruled on the State's repeated motions seeking a ruling on the preclusive effect of the Agreement on Hall's claims. Without a preliminary ruling from the court finding the document ambiguous, the parties were led to believe that the court was reserving to decide later the threshold legal question of whether the Agreement barred Hall's claims as a matter of law. When the court announced that the case was ready to go to the jury, the State reiterated its argument concerning the preclusive effect of the Agreement. The court responded: "Same ruling as before." The problem is that the court had made no previous ruling, other than putting off a ruling until later.

¶ 24. As a result, the case went to the jury without a ruling by the court on the Agreement. Neither attorney mentioned the

Agreement during closing argument. Nor did the court's instructions to the jury refer to the Agreement or the State's contention that, by signing the Agreement, Hall had waived any claim based on his reclassification and transfer. Nor was there any instruction for the jury to determine if Hall voluntarily and knowingly entered into the Agreement. The record does not make it clear what the attorneys were thinking at that point, but under the circumstances they reasonably could have assumed that the court was still reserving its judgment on the preclusive effect of the Agreement until after the jury rendered its verdict — even though it would seem to make little sense for the court to conduct the trial in that manner.

 ¶ 25. Without question, a decision on the scope, validity, and effect of the parties' Agreement was critical to the State's defense in this case. The Agreement was raised in the State's answer to the complaint, was asserted in its Rule 50 motion submitted to the court at the close of Hall's case, and was renewed after the close of evidence. While a party generally may waive its right to a ruling by failing to proceed with the motion or by acting in a manner inconsistent with the object of the motion, *Jones v. Suhre*, 345 A.2d 515, 518 (Me. 1975), in this case the court continued to inform the State that the matter was still under advisement. Therefore, a waiver could not be implied based on the State's failure to seek a jury instruction on the defense, given that the State reasonably assumed the defense was still under advisement by the court. In short, under the circumstances, the State cannot reasonably be said to have, at any time, voluntarily or knowingly waived its defense that, by signing the Agreement, Hall released the State from any legal challenge based on his reclassification and transfer.[5] See *Green v. United States*, 355 U.S. 184, 191 (1957) (noting that "waiver" is vague term used in multiple legal contexts but generally connotes voluntary relinquishment of known right).

¶ 26. We find no merit to Hall's argument that the State waived any objection to the court considering the ambiguity of the

[5] We note that Vermont does not have a deemed-denial rule or statute, as is the case in some states. Cf. *McCoy v. Moore*, 1 S.W.3d 11, 12 (Ark. 1999) (dismissing appeal as untimely filed based on rule providing that certain post-judgment motions are deemed denied after given period of time); *Paxton Res., L.L.C. v. Brannaman*, 2004 WY 93, ¶ 18, 95 P.3d 796 (same).

Agreement by allowing Hall to present "parol evidence" concerning the Agreement. Hall does not make it clear what "parol evidence" he is referring to, but he appears to be referring to evidence suggesting that the Agreement was unenforceable for a variety of reasons, including the alleged time pressure placed upon him and his attorney to decide whether to sign the Agreement. In any event, Hall's reliance upon *Gregoire v. Insurance Co. of North America*, 128 Vt. 255, 260, 261 A.2d 25, 28 (1969), is misplaced. In that case, the issue on appeal was whether the parol evidence rule should have precluded evidence admitted at trial of oral assurances made prior to or contemporaneous with the signing of a written release. *Id.* at 257, 261 A.2d at 26. This Court ruled that because the defendant had not objected at trial to admission of the testimony concerning the oral assurances, he waived any appellate argument that the parol evidence rule precluded admission of the testimony, which was properly considered by the jury. *Id.* at 260, 261 A.2d at 28. Here, in contrast, the State does not argue for the first time on appeal that the parol evidence rule precluded the admission of trial testimony concerning the Agreement. Rather, the State argues that the Agreement Hall signed precluded his claims in this case, and that it sought judgment at trial based on this argument, but the trial court never ruled on its motion. In short, *Gregoire* does not support Hall's argument that the State waived any defense based on the Agreement by not objecting to evidence presented at trial concerning the circumstances surrounding the signing of the Agreement.

¶ 27. Nor do we find any merit to Hall's argument that, even if we ignore the parol evidence he presented at trial challenging the enforceability of the Agreement, the language that his attorney added to the Agreement's release provision and the attorney's testimony as to the meaning of that additional language unambiguously demonstrate that the Agreement did not preclude Hall's claims. As noted, after reviewing the Agreement with Hall, Hall's attorney added the clause "specifically pertaining to the aforesaid 'hostile work environment' as stated, supra" at the end of the release provision in which Hall agreed to waive any claims against the State "associated in any way with his employment by the State of Vermont, the negotiation of this Agreement, and his reclassification as called for in this Agreement." At trial, Hall's attorney testified that the release provision appeared to require

Hall "to waive any grievance or lawsuit having to do with anything in the future. Any subject matter having to do with State government." According to his testimony, Hall's attorney insisted on including the additional clause to limit the waiver to claims concerning the hostile work environment complaint.

¶ 28. Neither the plain language of the added clause nor the attorney's testimony regarding his intent in adding that clause supports Hall's contention that the Agreement unambiguously allowed Hall's claims. Indeed, neither is inconsistent with the State's contention that the Agreement unambiguously released the State from liability for any claims that Hall might have related to his reclassification — which directly resulted from the hostile work environment complaint.[6]

¶ 29. Thus, assuming that Hall voluntarily entered into the Agreement, nothing in the language of the Agreement, as discussed above, provides the trial court with a basis for finding that, as a matter of law, the Agreement unambiguously permitted Hall's claims in this case. Rather, on remand, the trial court must consider whether the Agreement unambiguously precluded all or part of Hall's remaining retaliation claim or whether the language of the Agreement is ambiguous as to its preclusive effect on all or part of that claim in light of the circumstances surrounding the making of the Agreement, thereby requiring the court to instruct a new jury to that effect. See *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 579, 556 A.2d 81, 84 (1988) (holding that trial court may consider circumstances surrounding making of agreement in determining whether agreement is ambiguous, and noting that ambiguity exists when language of agreement in and of itself supports reasonable interpretation distinct from reasonable interpretation reached when language is read in light of surrounding circumstances); see also *Tilley v. Green Mt. Power Corp.*, 156 Vt.

---

[6] We also reject Hall's suggestion that the State had to prove its hostile work environment allegations for the trial court to rule that the Agreement precluded his retaliation claim. The State elicited testimony from the woman whose complaint led to the allegations. She testified that Hall had ignored her complaints about rumors circulating in the workplace concerning her personal life; that he had publicly embarrassed her in front of the entire garage; that he had treated her and others harshly and was verbally obscene when angry about what he perceived as a lack of support; and that he had reduced her to tears on one occasion. In any event, the State did not need to prove these allegations for the court to determine whether Hall had waived his retaliation claim by signing the Agreement.

91, 93-94, 587 A.2d 412, 413-14 (1991) (emphasizing that *Isbrandtsen* did not undercut parol evidence rule).

¶ 30. In sum, the State consistently and repeatedly argued that Hall waived any claims against the State based on his reclassification. That question was for the court to evaluate in the first instance. The failure of the court to resolve the State's Rule 50 motion is fatal to the validity of the ensuing jury verdict because, for the most part, Hall's retaliation claim was grounded on actions taken by the State pursuant to the September 2003 Agreement, and apart from those actions, there is insufficient support for the verdict. Accordingly, we vacate the jury verdict and remand the matter for the trial court to address the Agreement.

¶ 31. Hall's evidence and argument at trial with respect to his retaliation claim focused primarily on his demotion established by the Agreement and the resulting change in job duties. Indeed, Hall told the jury, in closing argument, that the adverse employment action against him was the demotion. Hall also presented evidence, however, on the State's alleged continuing retaliatory conduct, most particularly the video surveillance of him one day in May 2004. Unlike the demotion, the video surveillance did not stem directly from the September 2003 Agreement but rather from Hall's second workers' compensation claim. For that reason, notwithstanding our determination that the trial court failed to address in the first instance the preliminary and potentially determinative question of whether the Agreement precluded Hall's claims, we must address the State's argument that the video surveillance alone could not support the jury's verdict.

¶ 32. In its ruling denying the State's motion for relief from judgment, the trial court found that "[t]he only potentially adverse employment actions supported by any evidence were Hall's demotion in 2003 and video surveillance done of him in 2004." Hall does not directly challenge this finding, and the record supports it. In the court's view, however, "[t]he jury could reasonably have concluded that the only reason AOT conducted surveillance of Hall was in retaliation for his filing a workers' compensation claim, since that was obviously the reason the video was taken." Thus, according to the court, the only question was whether "the video surveillance meets the legal definition of an adverse employment action." Relying upon *Burlington Northern & Santa Fe Railway*

*v. White*, 548 U.S. 53, 57 (2006), which addressed the standard for determining what constitutes an adverse employment action in the context of a retaliation claim under Title VII of the Civil Rights Act of 1964, the trial court ruled that it was for the jury to determine whether "video surveillance by one's employer is the sort of action that could dissuade an employee from filing a [workers' compensation] claim."

█ ¶ 33. We agree with the State that the videotaping of Hall in connection with his second workers' compensation claim cannot, in and of itself, support Hall's retaliation claim. To make out a prima facie case of retaliation for filing a workers' compensation claim, a plaintiff must show, among other things, that "he suffered adverse employment decisions, and . . . there was a causal connection between the protected activity and the adverse employment decision[s]." *Murray v. St. Michael's Coll.*, 164 Vt. 205, 210, 667 A.2d 294, 299 (1995). In *Burlington Northern*, the Supreme Court held that a plaintiff bringing a retaliation claim under Title VII need show only that "a reasonable employee [in the employee's situation] would have found the challenged action materially adverse," meaning that it well might have dissuaded a reasonable employee from engaging in the protected activity. 548 U.S. at 68.

█ ¶ 34. Assuming, without deciding, that this is the standard to apply with respect to retaliation claims brought under 21 V.S.A. § 710(b), we conclude that the limited video surveillance in this case in connection with Hall's second workers' compensation claim cannot, in and of itself, support Hall's retaliation claim. The Court in *Burlington Northern* emphasized that "it is important to separate significant from trivial harms" because "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 67-68. One could certainly argue that the surreptitious videotaping of an employee, depending on its intrusiveness, could serve as supporting evidence of a retaliation claim. Thus, we do not necessarily disagree with Hall's contention that video surveillance can be submitted as evidence of a larger pattern of retaliation. But cf. *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 654 (7th Cir. 2001) (holding that change of schedule, video surveillance, and disciplinary warnings were not material adverse actions sufficient to sustain retaliation claim); *Pierce v.*

*Tex. Dep't of Crim. Justice, Inst. Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994) (holding that threatening employee to mind her own business, investigating her, videotaping her without her permission, and forcing her to take polygraph could not be considered adverse employment actions because they had no effect on conditions of employment).

■ ■ ¶ 35. But in this case, if the release provision in the parties' Agreement were found to preclude all claims associated with Hall's demotion, the limited video surveillance done in connection with Hall's second workers' compensation claim cannot, as a matter of law, support the retaliation claim. Cf. *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 39, 178 Vt. 244, 882 A.2d 1177 (holding that videotaping incident, among others, was insufficient to establish prima facie case that he suffered adverse employment action due to retaliation for his protected activity, in violation of Vermont Fair Employment Practices Act). The videotaping was done one day in public in response to a tip concerning Hall's activities. Hall claims that the tip came from his former supervisor, who was determined to terminate him. But we fail to see how video surveillance in response to a tip, regardless of its source, ostensibly to assure the legitimacy of a workers' compensation claim, would cause a reasonable person to forego the claim, unless the claim was fraudulent. In this context, video surveillance can be expected in response to a claim, and indeed the State has the right and responsibility to use such techniques to prevent fraudulent claims. If any video surveillance in connection with a workers' compensation claim could form the sole basis for a retaliation claim, it could well have the effect of pressuring the State into abandoning or unnecessarily restricting one of its legitimate tools for rooting out fraud in the filing of workers' compensation claims.

¶ 36. Given our determination that the trial court failed to address in the first instance the preliminary and potentially determinative question of whether the Agreement precluded all or part of Hall's retaliation claim, and that the video surveillance alone cannot support the jury's verdict, we must vacate the verdict and remand the matter for further proceedings. At this juncture, we decline to address the State's argument that Hall's award, even if it is upheld, must be capped at the then-relevant statutory limit set forth in 12 V.S.A. § 5601(b). The trial court avoided this issue by ruling that the issue was not jurisdictional in nature and that the State failed to timely raise it. In the event

there is another trial and Hall obtains a judgment in excess of the relevant statutory limit, the issue may be considered anew. We will not provide an advisory opinion on the assumption that those events will occur. For the same reason, we decline to address Hall's cross-appeal issues in which he challenges the trial court's refusal to grant him post-judgment interest and attorney's fees.

*The judgment is vacated and the matter is remanded to the civil division of the superior court for further proceedings consistent with this opinion.*