MFW Assocs., LLC v. Snowdance LLC, No. 175-3-08 Wrcv (Cohen, J., Aug. 3, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                           CIVIL DIVISION
Windsor Unit                                             Docket No. 175-3-08 Wrcv

MFW Associates, LLC
    Plaintiff

v.

Snowdance LLC, Snowdance Realty Co.,
Snowdance Ski Co., Snowdance Hotel Co.,
Steven Plausteiner, Susan Plausteiner,
Richard Frary, Joel Mael, and Textron Financial Corp.
    Defendants

### Decision on Pending Motions

At issue is the identification and prioritization of liens on the proceeds from the sale of the Garaventa CTEC High Speed Quad Chairlift to Peak Resorts for the price of $1.35 million dollars. Both parties have filed the equivalent of cross-motions for summary judgment. *Messier v. Metropolitan Life Ins. Co.*, 154 Vt. 406, 409 (1990); 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2720.

The main contest in this struggle for control over the remaining assets of the Ascutney Mountain Resort is between Steven and Susan Plausteiner and Dan Purjes and Myles Wittenstein. The two sides first became involved in the resort in 1998, when the Plausteiners became the majority owners of the company that operated the resort (Snowdance LLC) and Mr. Purjes and Mr. Wittenstein became the leading figures among the minority owners. Over the next decade, both sides invested additional funds in the resort by way of capital contributions, unsecured loans, or secured loans until the resort started defaulting on its obligations in 2008. At that time, Mr. Purjes and Mr. Wittenstein formed a new company called MFW Associates and bought its way into a more secured position on the resort assets. By July 2010, MFW Associates had taken control of the resort. All of these transactions are explained in more detail later in this opinion.

Other assets at the resort are owned by three other entities known as Snowdance Realty Company, Snowdance Hotel Company, and Snowdance Ski Company. All three of these entities are now and have always been owned and controlled by Steven Plausteiner and Susan Plausteiner. The present struggle for control is taking place between Snowdance Realty Company (Plausteiners) and Snowdance LLC (now controlled by MFW Associates).

The first ripples of the dispute began in 2000 when Snowdance LLC became interested in purchasing a high-speed quad chairlift for the ski resort. Snowdance LLC principal Steven Plausteiner negotiated the purchase of a new chairlift from a manufacturer known as Garaventa

CTEC for the price of $2.4 million dollars. Snowdance LLC financed the purchase with a $1.4 million dollar secured loan from CIT Group and a $1 million dollar unsecured loan from minority Snowdance investor Dan Purjes.

The terms of the secured loan from CIT Group are important. CIT Group agreed to provide the purchase-money financing in exchange for a first-priority secured position on the chairlift plus a promise that the chairlift would be "kept free" from any junior liens. Snowdance LLC was also required to assign its rights under the purchase-and-sale agreement for the chairlift to CIT Group. Snowdance LLC thereafter obtained possession of the chairlift and CIT Group filed a UCC financing statement to perfect its security interest in the high-speed quad chairlift.

In 2001, Snowdance LLC sought additional financing for general resort operations. It obtained two lines of credit from Textron Financial Corporation in exchange for security interests on condominiums, a hotel, and certain timeshare receivables.

In 2005, Snowdance LLC sought additional financing for general resort operations. It obtained another line of credit for up to $4.5 million dollars from a mezzanine lender known for purposes of this case as PRIF Ascutney in exchange for terms including a high interest rate, ownership pledges, and security interests in what can fairly be described as all of the property "now owned or hereafter acquired" by Snowdance LLC. Among the collateral described in the security agreement was all of the real estate, all of the improvements, and all of the equipment including the "ski tows and ski lifts."

Yet there is a question of fact as to whether PRIF Ascutney intended to take a security interest in the high-speed quad chairlift in 2005. The factual question arises because of Snowdance LLC's earlier promise to keep the chairlift free from junior encumbrances, taken together with several ambiguous references in the security agreement. (The court does not mean to suggest that CIT Group could have kept other creditors from taking a security interest in the chairlift; only that Snowdance LLC's earlier promise is relevant to a consideration of its intent in entering into the later security agreement, owing to the general desirability of harmonizing contractual agreements whenever possible.) One of those references describes the CIT Group security interest as a "permitted encumbrance"; another describes the chairlift as property that was "leased" from CIT Group rather than "owned" by Snowdance LLC. Yet another ambiguity arises from the UCC financing statement, which seems to omit the lift entirely, at least so long as the lift was not viewed as "after-acquired" property of Snowdance LLC. Viewing these ambiguities in the light most favorable to defendants, the court assumes for purposes of this opinion that PRIF Ascutney meant to take a security interest in the chairlift only at such time as the chairlift became owned by Snowdance LLC free and clear of the CIT Group note and lien.

At about the same time, PRIF Ascutney entered into a "subordination and intercreditor agreement" with Textron in which they agreed upon the priority to be accorded their respective security interests in the shared collateral. In pertinent part, the parties agreed as between themselves that PRIF Ascutney would have the first priority on the "ski tows and ski lifts," without further specificity, and that Textron would have the second priority on those items. Although there are numerous other terms in the agreement, the court has not found any specific

2

mention in the intercreditor agreement of the CIT Group note and security interest that would prevail over the general description of "ski tows and ski lifts."

Snowdance LLC defaulted on most of its obligations in 2008. Majority owners Steven and Susan Plausteiner thereafter began exploring the possibility of restructuring the company. They eventually generated an understanding that Mr. Purjes and Mr. Wittenstein would form a new company called MFW Associates and buy the PRIF Ascutney loan for the reduced price of $1.85 million dollars. It was understood that MFW Associates would then grant Snowdance LLC forbearances and release the Plausteiners from certain personal guaranties they had given. Snowdance LLC would then pay off the lift loan from CIT Group and obtain a release of the CIT Group lien in exchange for a settlement price of $250,000.

As the deals were coalescing in September 2008, however, the bottom fell out of the financial markets. Citing the uncertain marketplace, MFW Associates withdrew from the tentative deal to purchase the PRIF Ascutney loan. In an effort to save the deal, the Plausteiners rounded up $1 million dollars in financing from "family and friends" in exchange for preferred shares in Snowdance LLC. Snowdance LLC then used the cash as a partial pay-down of the PRIF Ascutney loan, and MFW Associates purchased the remaining PRIF loan and security interests for the reduced price of $850,000. MFW Associates also granted forbearances to Snowdance LLC and released the personal guaranties given by the Plausteiners.

Snowdance LLC then turned its attention to saving the chairlift from repossession—an issue that became suddenly acute when CIT Group filed an action for replevin on October 8th, 2008. Mr. Plausteiner decided to save the asset from repossession by personally contributing the $250,000 needed, but he was uncomfortable making another capital contribution to Snowdance LLC. He preferred instead to purchase the loan from CIT Group through one of the other companies he owned—Snowdance Realty Company—and to take an assignment of CIT Group's secured interest in the chairlift.

Mr. Plausteiner therefore made an offer to CIT Group for Snowdance Realty Company to purchase the loan and the security interest for the amount of $250,000. At the arbitration hearing, Mr. Plausteiner testified that CIT Group "didn't mind" how the deal was done so long as it received $250,000. In a more recent affidavit, Mr. Plausteiner refined his testimony to be that CIT Group "agreed" to this offer. For purposes of this decision, the court assumes that the evidence would be sufficient at trial to show an oral agreement on this point.

Yet CIT Group then mailed an integrated written agreement to Mr. Plausteiner containing the following terms: Snowdance LLC would pay $250,000 by a wire transfer to CIT Group as "payment in full" of the outstanding balance, and in exchange, CIT Group would "fully release" Snowdance LLC from all of its obligations under the note. CIT Group also agreed to "release" its security interest in the high-speed quad chairlift. The integrated written agreement furthermore included provisions stating that it was "the entire agreement between the parties," that it "supersede[d] any and all prior agreements" between the parties "whether oral or written," and that no modifications to the agreement would be effective unless made in writing.

3

Mr. Plausteiner signed the agreement on behalf of Snowdance LLC on October 14th. He now says that he signed the agreement even though it reflected "prior discussions" he had had with CIT Group and that it did not represent his "ultimate agreement" with CIT Group to do the deal as an assignment of the note and security interest to Snowdance Realty Company.

Mr. Plausteiner thereafter wired the money from a personal account. Mr. Plausteiner has since tried to suggest that the wire was untimely under the terms of the written agreement, but there is no evidence in the record that CIT Group rejected the payment as untimely.

Several weeks later, CIT Group mailed Snowdance Realty Company a UCC financing statement reflecting an assignment of the security interest from CIT Group to Snowdance Realty Company. Mr. Plausteiner also caused the books of Snowdance LLC to be updated around this time to show that the secured loan obligation had been assigned from CIT Group to Snowdance Realty Company.

About one month later, the Plausteiners arranged for Snowdance LLC to "sell" the high-speed quad chairlift to Snowdance Realty Company for the price of $10. In the bill of sale, Mr. Plausteiner represented that Snowdance LLC was the "lawful owner" of the lift and that Snowdance LLC had the right to sell it. The sale was allegedly done to make Snowdance LLC a more attractive applicant for a loan from the Vermont Economic Development Authority, but the VEDA loan was never consummated.

At around the same time, Snowdance Realty Company purchased the Textron note and security interest. Textron had accelerated its note in 2008 and had been collecting money from the secured timeshares receivables and applying those amounts to the outstanding amount due. After purchasing Textron's position, Snowdance Realty Company has been collecting the receivables.

In July 2010, MFW Associates took control of Snowdance LLC by virtue of the ownership pledges given as a term of the mezzanine loan.

At about the same time, the parties began an arbitration hearing in New York pursuant to an arbitration provision in the Snowdance LLC operating agreement. Mr. Purjes and Mr. Wittenstein filed an amended arbitration demand in which they claimed, inter alia, that the Plausteiners breached contractual obligations and fiduciary duties of loyalty by purchasing the CIT Group note on behalf of Snowdance Realty Company and by "selling" the lift to Snowdance Realty Company. Mr. Purjes and Mr. Wittenstein sought remedies including declarations that the assignment of the CIT Group note was void and that Snowdance LLC was the record title owner of the high-speed quad chairlift "free and clear" from any claims by the Plausteiners or Snowdance Realty Company. At the arbitration hearing, the parties litigated these issues.

After the hearing, however, Mr. Purjes and Mr. Wittenstein filed a memoranda in which they advised the arbitrator that many of their claims were now "moot" or were "going to be decided by the Vermont courts in connection with the liquidation of Snowdance's assets." Mr. Purjes and Mr. Wittenstein therefore asked the arbitrator to decide *only* the question of the ownership of the high-speed quad chairlift (and the question of whether to cancel two unrelated

4

promissory notes allegedly given by Snowdance LLC). Mr. Purjes and Mr. Wittenstein expressly asked the arbitrator *not* to make any rulings about the validity of the purported assignment of the note and security interest. In their own post-hearing memorandum, Steven and Susan Plausteiner asked the arbitrator to rule that Snowdance Realty Company had a valid lien on the high-speed quad chairlift by virtue of its purchase of the CIT Group note.

In his arbitration award, the arbitrator accepted the request by Mr. Purjes and Mr. Wittenstein to withdraw the claims that had become moot or that had become "the proper subject of litigation in the state courts of New York and Vermont." The arbitrator therefore clarified that he was deciding only three issues in his award: the ownership of the chairlift (which he awarded to Snowdance LLC) and the two unrelated promissory notes. The arbitrator did not make any other substantive rulings, except that he did say, at the end of his award, in what appears to be boilerplate language, that the award was "in full and complete settlement and satisfaction of any and all claims, counterclaims, defenses and set-offs properly submitted to the jurisdiction of this Arbitrator and any claim or counterclaim not specifically granted herein is nonetheless deemed denied." Snowdance Realty Company now argues that this last sentence amounted to a ruling that it has taken a valid assignment of the CIT note and security interest.

At around the same time as the arbitration hearing, Snowdance Realty Company failed to file a continuation statement in order to extend the effectiveness of the original UCC financing statement on the chairlift. The parties now dispute the legal effect of the lapse.

Finally, during this litigation and in anticipation of the sale of the high-speed quad chairlift to Burke Mountain, the parties entered into a February 2011 stipulation in which Snowdance Realty Company and the Plausteiners agreed to withdraw their objections to the sale of the chairlift in exchange for promises that the proceeds from the sale would be placed into escrow and that "regardless of the priorities in any documents and any claims by any parties, the amounts due under the promissory note from Snowdance [LLC] to Textron subsequently assigned to, and now held by, [Snowdance Realty Company] shall have first priority to all funds in the Escrow Account." As it happened, the proposed sale to Burke Mountain fell through, and the lift was instead recently sold the Peak Resorts. The sale has now closed, the lift is gone, and the sale proceeds are in an escrow account. The parties dispute whether the stipulated agreement remains valid as to the promise that Snowdance Realty Company will have first priority to the escrowed funds for the amounts due under the Textron note.

I

The issue is identifying which parties have a security interest in the high-speed quad chairlift. It makes sense to begin the analysis with the question of whether the original chairlift lien that was held by CIT Group as security for its purchase-money financing was assigned to Snowdance Realty Company in October 2008 or whether the note and security interest were instead released.

A

Snowdance Realty Company argues first that the arbitrator has already ruled that the purported 2008 assignment was valid.

5

An arbitration award "has the same force and effect of an adjudication in terms of precluding the same parties from relitigating the same subject." *Agway, Inc. v. Gray*, 167 Vt. 313, 316 (1997). An arbitration award is different from a judgment, however, because arbitration is a creature of contract. Parties are generally "free to arbitrate some parts of their dispute while setting other matters aside." *In re Shelburne Supermarket, Inc.*, 2010 VT 30, ¶ 20, 187 Vt. 514. Application of preclusion principles to an arbitration award therefore requires a finding that the claim to be precluded was "within the scope of the reference to arbitration." *Id.* (quoting Restatement (Second) of Judgments § 84 cmt. d (1982)).

Here, the evidence shows that Mr. Purjes and Mr. Wittenstein filed a post-trial memoranda in which they specifically withdrew their request that the arbitrator decide the validity of the 2008 assignment. In response, the arbitrator agreed not to decide the issue, noting that it had become the "proper subject" of state-court proceedings in Vermont. The best interpretation of this exchange is that the arbitrator agreed to let the claimants withdraw the issue from the scope of the reference to arbitration. As such, no preclusion attaches. *Shelburne Supermarket*, 2010 VT 30, ¶ 21; see also 18 Wright & Miller et al, Federal Practice and Procedure: Juris. 2d §§ 4413 & 4420 (explaining that preclusion should not attach to issues that were "withdrawn before decision").

Snowdance Realty Company responds by citing two Vermont cases from the mid-1800s for the position that an award has a preclusive effect as to matters that were "withheld" from the arbitrator as opposed to formally withdrawn. See *Barker v. Belknap's Estate*, 39 Vt. 168, 181 (1866); *Briggs v. Brewster*, 23 Vt. 100, 102 (1850). Snowdance Realty Company appears to be arguing that claimants' withdrawal was not effective because they failed to file a formal motion, but the answer here is that the withdrawal was formal enough for the arbitrator to have accepted it. No reason exists why preclusion should attach to an issue that was originally submitted to arbitration but then withdrawn before the final decision with the approval of the arbitrator. 18 Federal Practice and Procedure, *supra*, at §§ 4419–20; *Wolf v. Gruntal & Co, Inc.*, 45 F.3d 524, 529 & n.6 (1st Cir. 1995) (citing *Conforti & Eisele, Inc. v. William J. Scully, Inc.*, 469 N.Y.S.2d 400, 400–01 (N.Y. App. Div. 1983)). And to the extent that Snowdance Realty is suggesting that the old cases draw a distinction between the words "withheld" and "withdrawn," the passages from which those words are taken merely describe the ordinary rule that claim preclusion attaches to issues that should have been raised in an earlier proceeding but were not. Neither *Barker* nor *Briggs* hold that preclusion should attach when a judge or arbitrator allows an issue to be withdrawn from a case before final decision.

Snowdance Realty Company finally argues that the arbitrator nevertheless ruled on the validity of the purported assignment by denying all of the claims and counterclaims not specifically granted in the award. Snowdance Realty Company argues that this statement amounted to a denial of every claim asserted in the amended arbitration demand that was not expressly ruled on in the award. Such an interpretation cannot be squared with the arbitrator's express statement that he was deciding only the three identified issues. The boilerplate language should not be interpreted as expanding the scope of the arbitrator's decision beyond what he expressly said he was deciding. For these reasons, the court concludes that the parties have not yet obtained a final ruling on the issue of the validity of the purported assignments of the CIT Group note and lien.

6

B

The next question is whether CIT Group discharged its note and released its lien on the chairlift, or whether CIT Group instead endorsed the note and assigned the lien to Snowdance Realty Company. The fulcrum of the dispute is whether the terms of the October 2008 transaction were defined by an integrated written agreement between CIT Group and Mr. Plausteiner as a representative for Snowdance LLC or instead by an oral agreement between CIT Group and Mr. Plausteiner as a representative for Snowdance Realty Company.

As a threshold matter, the parties have argued whether Vermont law or New Jersey law governs the interpretation of the integrated written agreement. The court will accept for purposes of argument that New Jersey law applies, but the answer really does not matter because the approaches of the two states are identical for purposes of this case. Both states agree that extrinsic evidence is admissible for the purposes of understanding the circumstances under which a contract was made and shedding light upon the meaning of the contract. *Downtown Barre Development v. C&S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 8, 177 Vt. 70; *Conway v. 287 Corporate Center Assocs.*, 901 A.2d 341, 346–47 (N.J. 2006). More importantly, both states also agree that extrinsic evidence cannot be used for the purpose of repudiating a written agreement or varying its unambiguous terms. As the New Jersey Supreme Court wrote:

> Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose.

*Conway*, 901 A.2d at 347 (quoting *Atl. N. Airlines v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953)); accord *Downtown Barre Development*, 2004 VT 47, ¶ 8 (explaining that extrinsic evidence "may not be used to vary the terms of an unambiguous writing") (quoting *Kipp v. Chips Estate*, 169 Vt. 102, 107 (1999)).

7

In this case, the extrinsic evidence shows that Mr. Plausteiner originally negotiated a deal on behalf of Snowdance LLC with CIT Group for the discharge of its note and release of its lien in exchange for a discounted payment of $250,000. After the PRIF Ascutney deal fell through, however, Mr. Plausteiner no longer wanted to put up $250,000 as an additional unsecured capital contribution to Snowdance LLC. He instead wanted to take an assignment of the note and the security interest on the chairlift, so he asked CIT Group to assign its note and security interest to Snowdance Realty Company instead of discharging the note and releasing the lien. CIT Group either actually agreed to this proposal or did not care how the deal was done so long as it received a timely payment.

As the payment deadline approached, however, CIT Group sent Mr. Plausteiner a written settlement agreement in which CIT Group agreed to discharge the note and release the lien upon timely payment. No mention was made of any assignments or endorsements. Mr. Plausteiner signed the integrated agreement on behalf of Snowdance LLC even though he did not think that it represented his "ultimate agreement" with CIT Group.

Mr. Plausteiner then wired the $250,000 from a personal account. He made accounting entries in Snowdance LLC's books to show that the debt and the security interest had been assigned to Snowdance Realty Company. He also filed a UCC financing statement that showed that the security interest had been assigned to Snowdance Realty Company. He has testified that CIT Group prepared this financing statement and sent it to him.

Snowdance Realty Company is not arguing that the written agreement was ambiguous or that the meaning of the written agreement was something other than what was written in the document. Snowdance Realty Company is arguing instead that the written agreement was not the actual agreement between it and CIT Group: that when Mr. Plausteiner wired the money to CIT Group, he was doing so pursuant to the alleged oral contract between Snowdance Realty Company and CIT Group rather than pursuant to the written agreement.

There are a number of problems with Snowdance Realty Company's "follow the money" approach. The first is that the terms of the payment were defined in the written agreement: the money would be paid on behalf of Snowdance LLC in exchange for the release of the note and security interest. As a matter of contract interpretation, therefore, the use of extrinsic evidence to provide a different term of payment would be directly contrary to the parol-evidence rule.[1] See *Tilley v. Green Mountain Power*, 156 Vt. 91, 93 (1991) (a prior oral agreement cannot be used to contradict the terms of a later writing); *Conway*, 901 A.2d at 347 (extrinsic evidence cannot be used to show a contractual intention "wholly unexpressed in the writing").

The second problem is that there is no evidence that the written agreement somehow "failed" between the time of contract formation and the time of payment. Mr. Plausteiner has tried to suggest that the contract "failed" because he wired the money two days late, but there is no evidence that CIT Group refused the payment on grounds of timeliness. No other evidence of a breach exists either.

---

[1] The same reasoning applies to the attempts to introduce the UCC financing statement. It is being used as evidence of an oral agreement that would vary (indeed, nullify) the terms of the written contract.

Snowdance Realty Company has also suggested that Mr. Plausteiner was acting as an agent for Snowdance Realty Company at the time he sent the wire rather than as an agent for Snowdance LLC. As noted above, the argument is contrary to the terms of payment specified in the written agreement. In addition, even if the suggestion were true as a matter of fact, it would represent a fairly clear breach of the agent's duty of loyalty on the part of Mr. Plausteiner. See Restatement (Third) of Agency §§ 8.01–8.04 (explaining an agent's basic duties of loyalty, including the "duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors"). One of the possible remedies in such a situation would be to void the alleged contract made between the breaching agent and the third party. See Restatement (Third) of Agency § 8.01 cmt. d(1) (explaining possible monetary and non-monetary remedies for breach). As such, the written contract would eventually prevail under this theory as well.

The final problem is that there is no documentary evidence to show that Snowdance Realty Company ever became a holder of the underlying debt. Snowdance Realty Company has said that it purchased the loan, but has not attempted to prove that the note was transferred in any of the ways that would make it a holder under the Uniform Commercial Code. In the absence of an underlying debt, any security interest is ineffective.

For these reasons, the court concludes that the integrated written agreement provided the terms of the transaction, and there is no ambiguity in the meaning of the written agreement: in exchange for the payment of $250,000, the note and the security interest were discharged and released.

II

The next question is whether the description of the collateral in the PRIF Ascutney security agreement is sufficient to establish that MFW Associates now has a valid security interest in the high-speed quad chairlift. The applicable test is whether the description "reasonably identifies the collateral so that disputed as to the coverage of the security interest may be ironed out between the secured party and the debtor, and so that third parties, upon inquiry, can determine what collateral is claimed by the secured party." 9A Hawkland UCC Series § 9-203:6 [Rev] (June 2012). Here, the security agreement plainly covers "ski tows and ski lifts."

It is true that other provisions of the security agreement create a possibility that PRIF Ascutney did not intend to take a security interest in this particular ski lift right away—at least not so long as the CIT Group lien was in place and the chairlift was property that was leased by Snowdance LLC rather than owned. But even if those conditions mean what Snowdance Realty Company says they mean, the conditions expired by 2010, at the latest. After that point, the description of collateral in the security agreement was sufficient to cover the high-speed quad chairlift either as a "ski lift" or as after-acquired property. *In re Southern Vermont Supply, Inc.*, 58 B.R. 887, 891 (Bankr. D. Vt. 1986); 9A Hawkland UCC Series 9:204-1 [Rev] (June 2012). MFW Associates holds a valid security interest in the chairlift.

III

MFW Associates has also argued that Snowdance Realty Company lost its priority status as to any security interest it did have when it allowed its UCC financing statement to lapse in 2010 for failure to file a continuation statement. The foregoing rulings make it unnecessary to address the argument, but, for the record, the court will note that a lapsed financing statement destroys the perfected status of a security interest even as between parties to the same litigation. See *Thermal Supply, Inc. v. Big Sky Beef*, 2008 MT 355, ¶¶ 15–17, 197 P.3d 1227 (explaining that Revised UCC § 9–515(c) "simply delete[d] the tolling rule" that had been created by *Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 144 (2d Cir. 1988)).

IV

The court will also take the opportunity to address all of the other motions that are either pending or shown as pending on the court's internal docket.

A

As a matter of housekeeping, the court first addresses the motions that are shown as being under advisement on the court's docket but for which, for all practical purposes, decisions have already been made. In entering these dispositions of the motions, the court does not mean to upset any settled expectations of the parties, so if the parties think that the court has made an error here they may bring it to the court's attention by way of a motion to reconsider the specific ruling at issue. By "error," the court means that the ruling stated herein is contrary to what the parties had understood the court's ruling to be, not that the court made the wrong decision on the merits of the motion.

SRC'S Motion to File Amended Answer to the Supplemental Complaint (MPR #12), filed June 18, 2010, is ***granted***. Snowdance Ski Company, Snowdance Hotel Company, and the Plausteiners' Motion to File Amended Answer to the Supplemental Complaint (MPR #13), filed June 18, 2010, is ***granted***. Plaintiff's Motion for Service by Mail on Defendant Mael (MPR #15), filed June 30, 2010, is ***granted***. Plaintiff's Motion to Amend Complaint of Foreclosure (MPR #16), filed July 1, 2010, is ***granted***. Defendant Snowdance LLC's Motion for Relief From Judgment (MPR #21), filed January 18, 2011, is ***moot***. Defendant Snowdance LLC's Motion to Consolidate Disqualification and Injunction Motions (MPR #26), filed May 9, 2011, is ***moot***. Defendant Snowdance LLC's Motion for Injunctive Relief (MPR #28), filed May 9, 2011, is ***moot***. Defendant Snowdance LLC's Motion for Extension of Time (MPR #29), filed May 26, 2011, is ***moot***. Plaintiff's Motion to Amend Complaint of Foreclosure (MPR #32), filed June 8, 2011, is ***granted***. Defendant Snowdance Realty Company's Supplemental Motion (MPR #44), filed March 2, 2012, is treated as a motion to file a surreply and is ***granted***.

B

Snowdance Realty Company has moved for partial summary judgment on the question of whether Snowdance LLC defaulted on its obligations under the former Textron note. See V.R.C.P. 56(g) (2012) (summary judgment may be entered on issue of liability while leaving damages undetermined). Snowdance Realty Company failed, however, to support its original motion with evidence showing that there were no disputed material facts for trial and that it was entitled to judgment as a matter of law. *Price v. Leland*, 149 Vt. 518, 521 (1988).

Snowdance Realty Company attached supporting documentation to its reply brief that appears to be sufficient to show that there are no disputed material facts and that it is entitled to judgment as a matter of law on the issue of liability. In the interest of avoiding unnecessary effort, the parties are hereby ordered to treat the reply brief as if it were the original summary-judgment motion. Any party opposed to the granting of the motion must file an opposition stating a substantive reason therefor within 30 days of this order. See V.R.C.P. 56(e) (2012) (court may make any appropriate order towards equitable determination of summary-judgment motion).

C

Snowdance Realty Company has also moved for a partial distribution of the escrowed funds. It argues that it is entitled to at least the first $292,738 (plus per-diem interest) of the escrowed funds, and thus should be able to withdraw at least that amount, because the parties entered into a stipulation regarding the sale of the chairlift in which they agreed that the first funds from the escrow account would be paid to Snowdance Realty Company in satisfaction of the former Textron note.

As a procedural matter, the parties can expect that any request for partial distribution of the escrowed funds will be denied. Vermont Civil Procedure Rule 54(b) provides three prerequisites for the entry of a partial final judgment: (1) there must be multiple parties or multiple claims for relief, (2) at least one claim or the rights and liabilities of at least one party must be finally decided, and (3) the court must find that there is no just cause for delay. *Kelly v. Lord*, 173 Vt. 21, 31 (2001). In this case, even aside from the fact that Snowdance Realty Company has not yet obtained a final judgment on its cross-claim, the court does not believe that "earlier access to disputed funds from an escrow account" is a persuasive reason in favor of the entry of a partial final judgment under Rule 54(b). See 10 Wright, Miller, Kane & Marcus, Federal Practice and Procedure: Civil 3d § 2656 ("Rule 54(b) may be invoked only in a relatively select group of cases and applied to an even more limited category of decisions."). For this reason alone, the motion for partial distribution is denied.

MFW Associates has also opposed the motion on substantive grounds. MFW Associates argues that the stipulation was prepared as consideration for Snowdance Realty Company's agreement to withdraw its objections to the proposed sale of the lift to Burke Mountain for $1.5 million dollars. Obviously, the proposed Burke Mountain sale fell through, and the lift was eventually sold to Peak Resorts for $1.35 million dollars. MFW Associates now argues that (1) the stipulation applied only to the proposed Burke Mountain sale, (2) Snowdance Realty Company breached the stipulation by opposing the Peak Resorts sale and thus cannot now seek to enforce the terms of the original stipulation, and (3) the stipulation became ineffective when the court imposed its own terms on the escrow requirements for the sale of the chairlift to Peak Resorts. After reviewing the stipulation, the court has concluded that interpretation of the agreement is best undertaken as a factual matter at a merits hearing. *Hall v. State*, 2012 VT 43, ¶ 21.

D

By the court's count, there are three remaining substantive issues to be decided: (1) whether Snowdance Realty Company is entitled to a foreclosure judgment on the former Textron

11

note; (2) whether the pledge agreements given by the three Snowdance companies are recourse or non-recourse (the issue identified by the first summary-judgment decision); and (3) whether Snowdance Realty Company is entitled under the February 2011 stipulation to be paid first from the sale proceeds in satisfaction of the amounts due under the former Textron note. Beyond that, the only remaining issues in the case are the accounting of the amounts due and attorney fees. Unless the parties disagree, the court is prepared to address all remaining issues at an omnibus merits and accounting hearing.

* * * *

For the foregoing reasons, the court concludes that MFW Associates has a secured interest in the proceeds from the sale of the high-speed quad chairlift, and that the former CIT Group note and security interest were discharged and released by virtue of the 2008 transaction. Snowdance Realty Company may, however, subject to further rulings of the court, have a claim on at least some of the sale proceeds by virtue of its possession of the Textron note.

**ORDER**

(1) SRC'S Motion to File Amended Answer to the Supplemental Complaint (MPR #12), filed June 18, 2010, is *granted*.

(2) Snowdance Ski Company, Snowdance Hotel Company, and the Plausteiners' Motion to File Amended Answer to the Supplemental Complaint (MPR #13), filed June 18, 2010, is *granted*.

(3) Plaintiff's Motion for Service by Mail on Defendant Mael (MPR #15), filed June 30, 2010, is *granted*.

(4) Plaintiff's Motion to Amend Complaint of Foreclosure (MPR #16), filed July 1, 2010, is *granted*.

(5) Defendant Snowdance LLC's Motion for Relief From Judgment (MPR #21), filed January 18, 2011, is *moot*.

(6) Defendant Snowdance Realty Company's Motion to Determine Priority Status (MPR #25), filed May 2, 2011, is *denied*.

(7) Defendant Snowdance LLC's Motion to Consolidate Disqualification and Injunction Motions (MPR #26), filed May 9, 2011, is *moot*.

(8) Defendant Snowdance LLC's Motion for Injunctive Relief (MPR #28), filed May 9, 2011, is *moot*.

(9) Defendant Snowdance LLC's Motion for Extension of Time (MPR #29), filed May 26, 2011, is *moot*.

(10) Plaintiff's Motion for Partial Summary Judgment as to Priority Status of Chairlift Lien (MPR #31), filed June 6, 2011, is *granted*

(11) Plaintiff's Motion to Amend Complaint of Foreclosure (MPR #32), filed June 8, 2011, is *granted*.

(12) Defendant Snowdance Realty Company's Supplemental Motion (MPR #44), filed March 2, 2012, is treated as a motion to file a surreply and is *granted*.

(13) Any party opposed to the granting of Snowdance Realty Company's Motion for Summary Judgment (MPR #45), filed March 22, 2012 and as supplemented through May 11, 2012, shall file an opposition within 30 days of this order

(14) Defendant Snowdance Realty Company's Motion for Partial Distribution (MPR #49), filed May 21, 2012 (MPR #49), is *denied*.

(15) The clerk shall schedule an omnibus merits and accounting hearing for the remaining issues in the case.

Dated at Hartford, Vermont this _____ day of _____, 2012.

_____
William D. Cohen
Superior Court Judge

13