NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 26

No. 2018-224

| | |
|---|---|
| Northfield School Board | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Washington South Education Association | December Term, 2018 |
| and Paul Clayton | |

Mary Miles Teachout, J.

Bernard D. Lambek of Zalinger Cameron & Lambek, P.C., Montpelier, for Plaintiff-Appellee.

Wanda Otero-Weaver, General Counsel – Vermont-NEA, Montpelier, for Defendants-Appellants.

PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Morris, Supr. J. (Ret.),
Specially Assigned

¶ 1. **SKOGLUND, J.** Paul Clayton and Washington South Education Association (the Association) appeal the trial court's decision to grant Northfield School Board's (the Board) motion to enjoin arbitration. Clayton and the Association argue that the trial court erroneously held that Clayton was barred from utilizing the grievance-and-arbitration procedure contained in the collective-bargaining agreement (CBA) entered into by the Association and the Board. We conclude that, because Clayton and the Association failed to exhaust statutory remedies as required by 16 V.S.A. § 1752, the trial court properly enjoined arbitration, and thus, we affirm the trial court's ruling.

¶ 2.    Prior to addressing the specific facts in this case, we find it beneficial to briefly introduce the central statutory provision at issue in this case—16 V.S.A. § 1752. Titled "Grounds and procedures for suspension and dismissal," § 1752 outlines just that, the grounds for which "[a] teacher under contract to teach in a public school" may be suspended and ultimately terminated, and the pre-termination administrative procedures that both a school district and a teacher must follow prior to the ultimate disposition. Sections 1752(c)-(d) explain that "[a] superintendent may suspend a teacher under contract on the grounds of . . . conduct unbecoming a teacher," and that "[t]he suspension shall be in writing and shall set forth the grounds therefor." Once the teacher receives a written notice of their suspension, they "shall have the right to appeal to the board of school directors" and can initiate that appeal by "[f]iling a written notice of appeal with the clerk of the school board within seven days of the effective date of their suspension." Id. § 1752(e).

¶ 3.    Once the teacher initiates an appeal, the school board "shall hear the appeal within [ten] days of receipt of notification," notifying both the teacher and the superintendent of the hearing "at least three days before the date of hearing." Id. § 1752(f). "Upon hearing, or if no appeal is taken, the school board shall affirm or reverse the suspension or take such other action, including dismissal, as may appear just" in writing within five days and shall "within three days notify the superintendent and the teacher in writing of the decision." Id. § 1752(h-i).

¶ 4.    Section 1752(j) explains that "[n]o action shall lie on the part of a teacher against any school district for breach of contract by reason of suspension or dismissal unless the procedures herein described have been followed by said teacher." And further, "[e]very teacher's contract shall be deemed to contain the provisions of this section and any provision in the contract inconsistent with this section shall be considered of no force or effect." Id. § 1752(k).

¶ 5.    With this statutory framework in mind, the relevant facts of this case are as follows. The Association was the representative of all licensed teachers within the Northfield schools.[1]  The Board and the Association negotiated and entered into the CBA, which was in effect from July 1, 2017 to June 30, 2018.  Clayton was a middle-school physical-education teacher at the Northfield Middle High School (the School) and was a member of the Association.  Therefore, Clayton's employment was subject to the CBA.

¶ 6.    In late fall 2017, administrators at the School received complaints about Clayton's workplace conduct.  The complaints alleged that Clayton created a hostile work environment by intimidating his colleagues and advised a student (his daughter) to punch another student in the face. In response to the allegations, Clayton was placed on paid leave while the administrators investigated the complaints and interviewed a number of the School's staff.  Upon the conclusion of their investigation, the administrators wrote a letter to the School's superintendent describing their findings and noting that while they gave Clayton the opportunity "to respond to the claim that his actions had created a hostile work environment," Clayton first declined to respond to the allegations during an initial follow-up meeting and then declined to attend a second meeting scheduled to receive his rebuttal a few days later.  After receiving the administrators' letter, the superintendent wrote a letter to Clayton offering him an opportunity to meet with her to discuss the matter, and attached to the letter a summary of the allegations against Clayton.  About a week later, the superintendent met with Clayton and his Association representation.

¶ 7.    On December 1, the superintendent, Clayton, and his Association representation met for a second time.  At this meeting, the superintendent delivered a letter to Clayton, advising him that he was being suspended in accordance with 16 V.S.A. § 1752.  The letter explained that the

_____

[1]  Through June 30, 2018, the Northfield Middle High School was part of the former Northfield School District, itself a constituent part of the former Washington South Supervisory Union. The Board governed the Northfield School District. The Northfield School District has since consolidated with the Williamstown School District, forming the Paine Mountain School District.

superintendent found the allegations against Clayton to be well founded and was thus suspending Clayton because his actions demonstrated "conduct unbecoming a teacher," per § 1752(c). The letter also notified Clayton of his right to appeal the suspension decision to the Board and outlined the § 1752(e) procedures and deadline to bring such appeal.

¶ 8.    Neither Clayton nor anyone on his behalf filed a notice of appeal. As required by § 1752(h), the Board met in a warned executive session to review the superintendent's decision to suspend Clayton and recommendation in favor of dismissal. On December 14, the Board informed Clayton, via written letter per § 1752(i), that they unanimously affirmed his suspension and dismissed him from employment at the School, effective immediately.

¶ 9.    Shortly thereafter, Clayton and the Association, now represented by the Vermont affiliate of the National Education Association (Vermont-NEA), submitted a grievance alleging a violation of Article 6.1 of the CBA.[2] On the same day that they submitted the grievance, Vermont-NEA also sent a letter to the School's principal, requesting that the parties proceed directly from Step One (forwarding a written copy of the grievance to a school's principal) to Step Four (entering final and binding arbitration). The Board responded to Vermont-NEA's letter and declined to accept the grievance, explaining that Clayton waived his right to file a grievance under the CBA because he did not follow the statutorily-prescribed pre-termination procedures under § 1752 and therefore the grievance was barred as a matter of law.

¶ 10.    Vermont-NEA, on behalf of Clayton and the Association, disagreed with the Board's position and asserted that the Board could raise the argument to the arbitrator, who would decide the issue in the first instance. Vermont-NEA offered the names of three arbitrators and sent a letter to

---

[2] Article 14 of the CBA outlines a four-step process for the grievance procedure. Article 6.1 of the CBA explains: "No teacher who has successfully completed [their] probationary period will fail to have [their] contract renewed, be disciplined or reprimanded, suspended or dismissed, or receive an adverse evaluation without just cause."

the American Arbitration Association requesting that a panel of arbitrators select an arbitrator to hear and decide the grievance.

¶ 11. In response, the Board filed a complaint and motion to enjoin arbitration with the trial court, requesting that the court enter an order: (1) staying and dismissing the pending arbitration, pursuant to the Vermont Arbitration Act, 12 V.S.A. §§ 5673 and 5674(b); and (2) declaring that Clayton and the Association have no right to proceed to arbitration of the matter in dispute and enjoining the threatened arbitration, pursuant to the Declaratory Judgment Act, 12 V.S.A. § 4711. Clayton and the Association filed a motion to dismiss and argued that the provisions of 16 V.S.A. § 1752 were not intended to, and cannot, bar a teacher from pursuing binding arbitration to resolve a grievance. The trial court ruled in favor of the Board, granting their motion to enjoin arbitration.

¶ 12. This appeal followed. Clayton and the Association state the trial court misconstrued 16 V.S.A. § 1752, and therefore its decision enjoining arbitration is at odds with the plain language of the applicable statutes, the legislative intent of those statutes, this Court's existing precedent, and the public policy which favors enforcement of arbitration agreements. Moreover, Clayton and the Association argue that a grievance under the provisions of the CBA is not an "action" barred by § 1752.

¶ 13. The question before us is squarely one of statutory interpretation, which is a question of law that we review without deference. State v. Charette, 2018 VT 48, ¶ 6, __ Vt. __, 189 A.3d 67. "Our objective in statutory interpretation is to construe and effectuate the legislative intent behind a statute." State v. Hurley, 2015 VT 46, ¶ 9, 198 Vt. 552, 117 A.3d 433. "In interpreting the statute, we look first to the plain meaning to derive the intent of the Legislature." Cornelius v. The Chronicle, Inc., 2019 VT 4, ¶ 18, __ Vt. __, __ A.3d__; see also Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215 ("[W]e presume that the Legislature intended the plain, ordinary meaning of the statutory language."). But if the statute's "language is ambiguous, we

5

consider the statute's subject matter, effects and consequences, as well as the reason for and spirit of the law." Cornelius, 2019 VT 4, ¶ 18 (quotation omitted).

¶ 14. The crux of Clayton and the Association's argument is that Clayton, as a public school teacher, was permitted to elect either the appeals procedure under § 1752 or the grievance-and-arbitration procedures negotiated under the CBA because both are administrative remedies that provide two alternative avenues by which a teacher can challenge a dismissal and avoid litigation, with § 1752's procedures serving as a default unless otherwise negotiated. We disagree—the fundamental flaw in Clayton and the Association's argument is that it conflates and confuses pre-termination and post-termination review procedures. At the outset, we acknowledge that the CBA contains an enforceable arbitration clause, authorized by statute. See 16 V.S.A. § 2004. Section 2004 is part of the Labor Relations for Teachers Act that requires school boards, upon request, to negotiate with teachers' representatives on terms of employment, including "procedures for processing complaints and grievances relating to employment, and any mutually agreed upon matters not in conflict with the statutes and laws of the State of Vermont." However, for the reasons this Court explains below, the CBA's grievance-and-arbitration clause is applicable to post-termination actions, and cannot be substituted for § 1752's pre-termination procedures.

¶ 15. First, Clayton and the Association argue that the trial court's decision enjoining arbitration is at odds with the plain language and the legislative intent of 16 V.S.A. § 1752 and § 2004. To support their "alternative-avenues" assertion, Clayton and the Association point toward language in § 1752—"[u]nless otherwise negotiated." The quoted language is found in subsection (b) of § 1752, which discusses the procedures for the nonrenewal of a teacher's contract to teach in a public school. It does not, as Clayton and the Association posit, expressly qualify "[t]he statutory clause that introduces the procedure for appeals of adverse employment decisions," and therefore, it does not have "the effect of making the Section 1752 appeals procedure a default, unless the parties negotiate a different procedure." We "presume that the Legislature chose its words

6

advisedly," and thus we decline to take words of one subsection and insert them into another. State v. Roy, 2018 VT 67A, ¶ 15, __ Vt. __, __ A.3d __ (quotation and alteration omitted). Based on the absence of "unless otherwise negotiated" in § 1752(c)-(j), which expressly outline the suspension and dismissal procedures, we cannot conclude that the Legislature intended to allow teachers to negotiate alternative pre-termination procedures, but instead intended a teacher to exhaust the procedures provided in § 1752 prior to availing themselves of judicial remedies or alternative grievance procedures, such as those negotiated in the CBA.

¶ 16.    Clayton and the Association also assert that because the § 1752 procedures to resolve disputes over suspensions, dismissals, and nonrenewals are easily reconciled with the mandate in § 2004 for negotiation of alternative procedures to resolve the same disputes, it is clear that the Legislature contemplated that negotiations of the type now mandated by § 2004 would occur. Section 2004 authorizes schools and teachers' representatives to negotiate various terms of employment, including "procedures for processing complaints and grievances relating to employment." It does not, as Clayton and the Association suggest, authorize parties to negotiate terms that would contravene the provisions of § 1752. As explained above, the only provision in § 1752 that is subject to negotiation is subsection (b), which deals with the nonrenewal of a teacher's contract. If the Legislature intended to make the entirety of § 1752 subject to negotiation, it would have explicitly included "unless otherwise negotiated" in each subsection or in an introductory subsection that applied to the section as whole. This Court, again, declines to transplant words from one subsection and insert them into another.

¶ 17.    Second, Clayton and the Association argue that the trial court's decision enjoining arbitration is at odds with Vermont's public policy which favors enforcement of arbitration agreements and is antithetical to the express purposes of the Vermont Arbitration Act, 12 V.S.A. § 5652. We agree with Clayton and the Association's assertion that "Vermont law and public policy strongly favor arbitration as an alternative to litigation for the efficient resolution of disputes."

Lamell Lumber Corp. v. Newstress Int'l, Inc., 2007 VT 83, ¶ 9, 182 Vt. 282, 938 A.2d 1215 (quotation omitted and emphasis added). Arbitration agreements are "expressly authorized by the Vermont Legislature." Morton v. Essex Town Sch. Dist., 140 Vt. 345, 348, 433 A.2d 447, 449 (1981). However, we do not find that this sound public policy—favoring arbitration over litigation—supports Clayton and the Association's assertion that a teacher is entitled to elect between § 1752 pre-termination procedures and negotiated arbitration procedures. The § 1752 procedures cannot be described as litigation. They are procedures, internal to the school district, to determine whether a teacher's suspension should be confirmed and if other actions, including dismissal, are appropriate.

¶ 18. And third, Clayton and the Association argue that the trial court's decision enjoining arbitration is at odds with the precedent of this Court. We have repeatedly explained that "[w]here a collective bargaining agreement establishes grievance and arbitration procedures for the redress of employee grievances, the law is settled that an employee must at least attempt to exhaust these procedures before resorting to judicial remedies." Ploof v. Vill. of Enosburg Falls, 147 Vt. 196, 200, 514 A.2d 1039, 1042 (1986) (emphasis added). Nothing in this opinion should be construed to detract from this assertion.

¶ 19. To support their assertion that a teacher has two alternative procedures from which they may elect—statutory procedures under § 1752 or arbitration procedures under the CBA—Clayton and the Association rely heavily on Brattleboro Union High Sch. Bd. v. Windham Se. Educ. Ass'n, 137 Vt. 1, 398 A.2d 285 (1979). In Brattleboro, this Court asserted that "most arbitration agreements are entered into for the precise purpose of providing an alterative to judicial remedies." Id. at 3, 398 A.2d at 286. We again affirm that arbitration agreements are frequently used, and encouraged, for that precise reason—to avoid judicial remedies. However, this assertion does not support Clayton and the Association's argument that a teacher may elect to either follow the pre-termination statutory procedures under § 1752 or the arbitration procedures under the CBA. Section

8

1752 provides pre-termination procedures during which a school board has the opportunity to either affirm or decline to accept a superintendent's recommendation to suspend or dismiss a teacher, thus creating a final disposition for the disciplinary actions against a teacher. The arbitration procedures under the CBA provides an alternative, nonjudicial avenue to challenge said school board's final decision.[3]

¶ 20. In sum, while this Court encourages the enforcement of fair arbitration clauses, that is not to say that arbitration clauses can be so broadly applied as to subsume the required statutory pre-termination procedures. This decision does not hold, and the Board does not argue, that Clayton or another teacher subject to the CBA can never pursue arbitration. It does, however, stand for the conclusion that the Legislature intended to require teachers to participate in pre-termination proceedings under § 1752 in order to preserve their right to bring a post-termination action, either through a lawsuit or a grievance pursuant to an arbitration agreement.[4]

---

[3] Clayton and the Association cite several other cases in an effort to support their argument, but this Court does not find these cases applicable. Clayton and the Association first cite Rich v. Montpelier Supervisory Dist., 167 Vt. 415, 709 A.2d 501 (1998). We find that Rich is inapplicable here because that case dealt with a nonrenewal of a teacher's contract, which is governed by § 1752(b) "unless otherwise negotiated." Clayton and the Association then turn towards Morton, where this Court affirmed that bargained-for grievance procedures are "expressly authorized by the Vermont legislature" and "provide a reasonably amicable method of resolving disputes in the least expensive and most expeditious manner possible." 140 Vt. at 348-49, 443 A.2d at 449. However, the teacher in Morton attempted to proceed directly to litigation after his notice of dismissal, instead of following the grievance procedure outlined in his CBA—Morton is not a case discussing pre-termination procedures required by § 1752.

Simply put, all of these cases provide support for the assertion that CBAs promoting arbitration over litigation are enforceable and encouraged, and that when these agreements are present, a teacher is required to exhaust the remedies provided under them prior to proceeding to litigation. They do not, as Clayton and the Association assert, support the elimination of § 1752's required statutory pre-termination procedures.

[4] Clayton and the Association argue that applying an exhaustion requirement to § 1752 procedure just creates a circular and repetitive process for a teacher who is facing suspension and dismissal. We disagree for two reasons. First, procedures leading up to a final dismissal determination and procedures challenging said dismissal are inherently different in their nature. The first permits the school board to determine whether a superintendent's suspension and recommendation for dismissal of a teacher is well founded and should or should not be affirmed.

9

¶ 21. Next, we address Clayton and the Association's argument that a grievance under a CBA is not the type of "action" § 1752(j) seeks to preclude. Section 1752(j) reads: "No action shall lie on the part of a teacher against any school district for breach of contract by reason of suspension or dismissal unless the procedures herein described have been followed by said teacher." Clayton and the Association posit that the term "action" is limited to a judicial action, and that a dismissed teacher who failed to exhaust the § 1752 procedures is barred from going to court to challenge the dismissal, but is not barred from pursuing arbitration through a CBA's grievance procedure.

¶ 22. As noted above, this Court's fundamental goal in statutory interpretation "is to discern and implement the intent of the Legislature." Patnode v. Urette, 2015 VT 70, ¶ 7, 199 Vt. 306, 124 A.3d 430 (quotation omitted). "We look first to the plain language of the statute, and, if this is insufficient to determine legislative intent, we consider the broad subject matter of the statute, its effects and consequences, and the purpose and spirit of the law." In re Swanton Wind LLC, 2018 VT 141, ¶ 7, __ Vt. __, __ A.3d __ (quotation omitted).

¶ 23. "Action" is defined as: "1. The process of doing something; conduct or behavior. 2. A thing done; act . . . 4. A civil or criminal judicial proceeding." Action, Black's Law Dictionary (10th ed. 2014). The plain language's meaning and definition is broad, and it is unclear from it whether "action" should be limited only to exclusively judicial proceedings or is broader to include any proceeding, including arbitration, against a school board. Because we do not find the plain language clearly instructive to the Legislature's intent, we turn toward "the broad subject matter of the statute, its effects and consequences, and the purpose and spirit of the law." Swanton Wind,

_____

The latter examines the school board's ultimate decision to dismiss the teacher. And second, while we acknowledge that Steps One through Three of the CBA's grievance procedure include many of the same parties that would be involved in pre-termination procedures—the principal, the superintendent, and the Board—based on Clayton and the Association's own representation, it appears that a teacher can request that the Board waive Steps One through Three and move directly to Step Four (final and binding arbitration), thus skipping the allegedly duplicative proceedings. In fact, Clayton and the Association requested just that in this case.

2018 VT 141, ¶ 7 (quotation omitted). The narrow and rigid interpretation that Clayton and the Association advance does not give effect to the legislative intent behind § 1752's pre-termination proceedings, which present themselves as the classic exhaustion requirement. See, e.g., Stone v. Errecart, 165 Vt. 1, 675 A.2d 1322 (1996) (affirming trial court's dismissal for plaintiffs' failure to comply with statutory-exhaustion requirement of 32 V.S.A. § 5887, under which taxpayer may challenge tax refund in superior court, but only after appealing under statutory scheme).

¶ 24. Therefore, we conclude that "action" under § 1752 encompasses both judicial proceedings and proceedings under CBAs, including grievance-and-arbitration proceedings. Compliance with the pre-termination appeal procedures is a condition that must be met in order to be eligible to bring any post-termination review action, whether that review is by judicial action or by action utilizing a CBA's grievance process. We believe that the Legislature intended to create a statutory scheme that requires a teacher who is under consideration for dismissal to take advantage of their right to a pre-termination hearing before the school board if they wish to have their case reviewed thereafter. The statutory requirement that a teacher participate in a pre-termination hearing is intended to ensure that the teacher has proper due-process protections and the school board has complete information, including facts and arguments offered by the teacher, before making such an important, and possibly career-ending, decision.

Affirmed.

FOR THE COURT:

_____
Associate Justice

11